# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

ALLSTATE INSURANCE COMPANY,

        Plaintiff,                Civil Action No. 1:24-cv-00933

      v.

JOHN CRUZ and PIP PERSONAL
IDENTITY PROTECTION LLC,

        Defendant.

### AFFIDAVIT OF DAVID BARGE

I, David Barge, on behalf of Plaintiff Allstate Insurance Company ("Allstate"), in the above-referenced matter, having been duly cautioned and sworn, depose and state as follows:

1.      I am the District Sales Leader for Arizona and Colorado at Allstate Insurance Company. I have been employed with Allstate since April of 2021.

2.      Defendant John Cruz is a former Allstate Agent who sold Allstate products from 2011 to 2020. *Allstate Ins. Co. v. John Cruz,* Case No. 20-cv-03139-DDD-MEH (D. Colo.) at Dkt. 1, ¶ 22 (attached hereto as **Exhibit 1**).

3.      Under the terms of Cruz's Exclusive Agency Agreement, he could not sell insurance products that compete with Allstate while an Allstate Exclusive Agent. *Id.* at ¶ 5. In October 2019, an internal Allstate investigation revealed that Cruz was selling insurance products in competition with Allstate in clear violation of the terms of the Agreement. *Allstate Insurance Co. v. John Cruz* and *PIP Personal Identity Protection LLC,* Case No. 24-cv-00933 (D. Colo.) at Dkt. 1 ¶ 20 (attached hereto as **Exhibit 2**).

1

4.       As a result, Allstate terminated Cruz's Agreement and ended its relationship with Cruz. *Id.* Yet, following his termination, Cruz continued to violate the surviving terms of the Agreement, including by soliciting business from Allstate customers. *Id.* at ¶ 21.

5.       Allstate filed suit against Cruz for breach of the Agreement and misappropriation of trade secrets on October 20, 2020 in the United States District Court for the District of Colorado. *Id.* at ¶ 22.

6.       Cruz filed six counterclaims in that lawsuit. As part of those counterclaims, Cruz asserted that Allstate sells its personal customer information to third parties. *Id.*

7.       Allstate does not sell its personal customer information to third parties. *Id.* at *e.g.,* ¶ 50.

8.       The first *Allstate v. Cruz* case had a Protective Order. *Allstate v. Cruz*, Case No. 20-cv-03139-DDD-MEH (D. Colo.) at Dkt. 55 (attached hereto as **Exhibit 3**).

9.       During the first case against Cruz, Allstate marked several documents and deposition transcripts "Confidential" under the Protective Order, including "Buyer Depot,"[1] Richard Poduska, Elise Teague, Erika Lousberg, Jodi Lynch, Dino DiCarlo, and Rebecca Martens. **Ex. 2** at ¶ 23.

10.     Both parties moved for summary judgment. On April 14, 2023, Magistrate Judge Michael Hagerty recommended granting Allstate's motion and denying Cruz's motion. *Allstate v. Cruz,* Case No. No. 20-cv-03139-DDD-MEH (D. Colo.) at Dkt. 221 (attached hereto as **Exhibit 4**).

---

[1] This deposition transcript is unknown to Allstate, but the first page of the partial deposition transcript references the case number for the First Action.

11. On September 20, 2023, District Judge Nina Wang adopted the Recommendation and granted Allstate's motion for summary judgment on all of Cruz's counterclaims, denied Cruz's request for summary judgment on those counts, and granted Allstate's motion for summary judgment on its breach of contract claim as to liability. *Allstate v. Cruz,* Case No. No. 20-cv-03139-DDD-MEH (D. Colo.) at Dkt. 236 (attached hereto as **Exhibit 5**).

12. On March 5, 2024, the Court held a status conference. Cruz represented that he did not intend to appeal the Court's summary judgment ruling and that he was willing to dismiss his claims. *Allstate v. Cruz,* Case No. No. 20-cv-03139-DDD-MEH (D. Colo.) at Dkt. 275 (attached hereto as **Exhibit 6**).

13. In late March 2024, Allstate discovered that Defendant John Cruz and his company PIP Personal Identity Protection, LLC, were posting false information about Allstate online. **Ex. 2** ¶ 1. Allstate filed a Complaint for defamation and violation of Colorado's Consumer Protection Act (C.R.S. § 6-1-105) on April 5, 2024. *See* **Ex. 2**.

14. Specifically, Allstate learned that Defendants created at least two identity theft protection websites that contain lies about Allstate: www.savemepip.com and www.pip-personalidentityprotection.com. *Id.* at ¶ 2. The websites both make various false claims about Allstate, including that Allstate sells its customers' sensitive personal information for gift cards. *Id.* at ¶ 5. The websites state that they can help "to protect the identity of anyone who gave Allstate Insurance Company their personal information. Name, Social Security Number, Date of Birth, Drivers' License. Anyone who gave their personal information to any of Allstate subsidiary companies." *Id.* at ¶¶ 37–38.

15. The two websites allege that Allstate requires its representative to follow three rules: "(1) use Allstate electronic communications, email, phone, fax. Used to transfer your

3

personal information; (2) representatives are "not allowed to report to any government agency"; and (3) "the only form of payment allowed to be paid to Allstate representatives." *Id.*

16.     The two websites also share multiple animated videos linking Allstate to human trafficking and rape. The first video falsely states: "a chilling tale of identity theft and its devastating consequences, a seemingly innocent transaction that Allstate turns into a tragic human trafficking scheme." The video claims that nefarious actors can purchase "personal information (names, addresses, social security numbers, and driver's license details" with "gift cards." *Id.* The narrative further claims: "a father in dire need seeking asylum for his wife (47) and daughter (13) finds his hopes shattered… His wife and daughter were beaten, raped, murdered. Only through the purchased identities were they identified; their lives taken for a few thousand dollars. As authorities trace back confronting a man who claims missed family, the truth emerges. Allstate's negligence in safeguarding customers' data, refusing accountability, is a betrayal of trust. Their silence leaves lives shattered. A stark reminder of the grave consequences of unchecked information sharing." *Id.*

17.     A second video on the websites says, "Allstate refers, shares and transfers identities to anyone," including a sex trafficker who impregnated a missing child and used stolen identities purchased from Allstate to continue his criminal activity. *Id.*

18.     A third video on the websites says that Allstate traded "an unwitting Allstate customer['s]" name, social security number, birthdate, and address for gift cards, which ultimately led to this individual's identity being stolen, "destroyed credit, unpaid debts, and a life in disarray." *Id.*

19.     A fourth video claims Allstate sold a customer's personal information after that customer shared his "personal information on Allstate's site" to secure an Allstate warranty for a

washer and dryer he had purchased. The "sold" information resulted in the customer "arrested for three major speeding tickets." The video concludes by stating "Allstate's careless data handling shattered trust. Sadly, Allstate refers, shares, and transfers your identity to anyone paid with gift cards. This is what can happen to you when getting insurance from Allstate. Keep safe. Keep Happy." *Id.*

20.     These claims are false. Allstate is not actively participating or complicit in human trafficking and rape. Allstate does not sell its customers' personal information for gift cards, or otherwise. Allstate abides by all federal, state, and local laws, rules, and regulations. *Id.* at ¶¶ 49–57.

21.     Both websites also publish deposition transcripts that were marked confidential under the Protective Order in the *Allstate v. Cruz* matter. The websites say, "Allstate representatives have stated under oath in Federal Court, Allstate representatives are allowed to refer/share/transfer your personal information to anyone." *Id.* at ¶¶ 4, 37–38.

22.     Allstate discovered that Defendants have posted false statements about Allstate on LinkedIn, Instagram, Facebook, and YouTube. The statements include false references to Allstate selling its customers' sensitive personal information in exchange for gift cards. Allstate has discovered at least 8 LinkedIn posts, 3 Facebook posts, 4 Instagram posts, and 1 YouTube video thus far. *Id.* at ¶¶ 41–44.

23.     There are numerous other posts on these social media platforms that provide hyperlinks to the PIP websites. All of these posts have occurred since February 2024. *Id.* at ¶ 41.

24.     Additionally, Defendants purchased ad space through Coventry First, LLC, resulting in advertising for one of their websites being aired on MSNBC in the Chicago market at 11:54 a.m. local time on Thursday, March 28, 2024. That ad directed viewers to

https://savemepip.com/. The same advertisement aired on CNN's local affiliate in the Chicago market around the same timeframe. The advertisement was also published on CNN's website. *Id.* at ¶¶ 45–48.

25.     Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

AFFIANT FURTHER SAYETH NAUGHT

Dated:  April 10, 2024

eSigned by David Barge
_____

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

ALLSTATE INSURANCE COMPANY,

        Plaintiff,

   v.

JOHN CRUZ,

        Defendant.

---

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF
## (JURY DEMAND)

---

Plaintiff Allstate Insurance Company ("Allstate") alleges as follows for its Complaint for Injunctive and Other Relief against Defendant John Cruz ("Cruz"):

### <u>NATURE OF THE ACTION</u>

1.     This action is the result of Cruz flagrantly breaching certain promises and obligations he made to Allstate. Specifically Cruz executed an Allstate R3001S Exclusive Agency Agreement ("EA Agreement") with Allstate effective April 1, 2010. The EA Agreement allowed Cruz to become an Exclusive Allstate Agent, to receive Allstate confidential information, to sell Allstate insurance products and services, and to receive commissions for the sale of Allstate products and services.

2.     Under the EA Agreement, Cruz: (a) acknowledged that he would be granted access to Allstate confidential information and that Allstate confidential information is the property of Allstate; (b) agreed to not use Allstate confidential information for his own benefit or disclose

Allstate confidential information to third parties; (c) promised to not solicit Allstate customers for one year after the EA Agreement terminated; (d) promised to return all confidential information to Allstate upon the termination of the EA Agreement; and (e) promised to transfer all telephone numbers that he used while performing services under the EA Agreement to Allstate upon termination of the EA Agreement.

3.      Cruz's EA Agreement terminated on August 26, 2020.  Unfortunately, Cruz refused on August 26, 2020 (and continues to refuse) to a) transfer all telephone numbers that he used while performing services under the EA Agreement ("Allstate number"), b) return all Allstate confidential information to  Allstate, and c) stop holding himself out as an Allstate agent.

4.      Unfortunately and despite repeated demands for the return of Allstate confidential information and the transfer of the Allstate telephone number, Cruz continues to possess confidential Allstate customer information and refuses to transfer the Allstate telephone number to Allstate.

5.      Even more disturbing, Cruz is now using the stolen Allstate confidential information and Allstate telephone number to solicit Allstate customers and illegally compete with Allstate.

6.      In fact, on September 30, 2020, Cruz sent a solicitation email to Allstate customers. Cruz's solicitation email disparaged Allstate and informed the Allstate customer that Cruz is "in the process of transitioning to working as an insurance agent with my family's insurance brokerage called Colorado Premier Insurance."

2

7.      Cruz also informed the Allstate customer that he will "continue being an insurance agent with a broader range of services and multiple insurance companies," and "looked forward to talking to [the Allstate customers] soon."

8.      Cruz's actions are a clear violation of the EA Agreement, as well as common and statutory law.  Cruz's actions also threaten significant and continuing irreparable harm to Allstate. As a result, injunctive relief is necessary and appropriate to prevent further injury to Allstate.

9.      Consequently, Allstate now brings suit against Cruz for breach of contract, misappropriation of trade secrets, unfair competition, and tortious interference. In doing so, Allstate requests that this Court enter an order: (1) compelling Cruz to return all Allstate property, including all Allstate confidential information, in his custody, possession or control to Allstate; (2) enjoining Cruz, and anyone acting in concert with him, from using, possessing or having access to Allstate confidential information and property; (3) compelling Cruz to transfer the Allstate telephone number; (4) enjoining Cruz, and anyone acting in concert with him, from soliciting Allstate customers through August 26, 2021; (5) awarding Allstate compensatory and exemplary damages for Cruz's intentional acts; and (6) awarding Allstate its reasonable attorneys' fees as provided for under the EA Agreement, as well as applicable Colorado and federal law.

## THE PARTIES AND RELEVANT ENTITIES

10.     Allstate is an Illinois corporation with its principal place of business located in Northbrook, Illinois.

11.     Upon information and belief, Cruz is a citizen of the State of Colorado and resides in Longmont, Colorado.

## JURISDICTION AND VENUE

3

12.     This Court has subject matter jurisdiction over this dispute, pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331, because Allstate's claims against Defendants under the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*, raise a federal question. Allstate's remaining claims fall within the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, because the claims are so related to the federal question that they form part of the same case or controversy. Alternatively, this Court has diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a), because this action and controversy is between citizens of different states and exceeds the value of $75,000, exclusive of interest and costs.

13.     This Court has personal jurisdiction over Cruz because Cruz is a citizen and resident of the State of Colorado. Venue is proper in the United States District Court for the District of Colorado, pursuant to 28 U.S.C. § 1391(b), because the Cruz resides in this District and a substantial part of the events giving rise to Allstate's claims occurred in this District.

## BACKGROUND

### Allstate's Business and Hiring of Independent Exclusive Agents

14.     Allstate is one of the nation's leading providers of insurance and financial products and services to individuals and businesses. Among other things, Allstate provides automobile insurance, property and casualty insurance, life insurance, and financial services and products to individuals and businesses.

15.     In addition to providing these products and services (collectively "products") directly, Allstate appoints independent exclusive agents ("EAs"), through its Exclusive Agency Program, to sell Allstate products.

16.     Allstate rigorously screens its EAs in order to ensure that they are qualified to represent and sell Allstate products, have the proper tools and facilities to analyze and meet customer needs, and can furnish customers with appropriate insurance solutions.

17.     EAs, including Cruz, are provided training by Allstate once they become EAs. In that process, they are provided confidential information regarding the products offered by Allstate, as well as business strategies that assist them with developing business. EAs are also provided highly proprietary and confidential information about Allstate's business model in order to assist them in their role as EAs. This includes confidential information that the EAs would not have access to prior to becoming an EA with Allstate.

18.     Allstate expends substantial resources advertising, marketing, and promoting its products. The EAs benefit directly and indirectly from Allstate's advertising, marketing, and promotional efforts, as well as from Allstate's goodwill, reputation, and name recognition.

19.     These efforts and expenditures allow the EAs to develop and cultivate accounts and relationships on behalf of Allstate.

20.     Accordingly, Allstate relies heavily upon repeat business and renewal of policies to maintain its competitive advantage. Maintaining goodwill and a solid business reputation with its customers is a critical component of Allstate's success. Indeed, because Allstate's business is a service business, the relationship that each EA has with Allstate customers is highly dependent on the attention and excellent service given to the customer on an ongoing basis, and the continued trust the customers place in Allstate as a leading provider of such services.

21.     Allstate and its customers entrust Allstate EAs to safeguard and protect their private information, which includes information relating to, among other things, their personal data, date

5

of birth, social security numbers, types of policies, amount of insurance, premium amounts, renewal dates of policies, description and location of assets and property, claims histories, insurance needs, pricing information, and other insurance coverage information, from unauthorized use or disclosure. Access to confidential information regarding Allstate customers was provided to or gained by Cruz because he was an EA for Allstate. Cruz did not have access to confidential information about Allstate customers before entering into his relationship with Allstate.

22.     Allstate protects the information described in Paragraphs 17 and 21 by, among other things:  limiting the disclosure and use of this information to only the EA (EA employees are expressly denied access to such information unless they sign a Confidentiality and Non-Competition Agreement with Allstate); educating the EA about the requirement and necessity of keeping this information confidential; restricting access to this information by restricting access to computer networks and requiring the use of passwords to access the information; and, as discussed above, requiring the EA to execute a written agreement that protects against the misuse and improper disclosure of Allstate confidential information.

23.     Consequently, all EAs, under their EA Agreements, and while performing services under the EA Agreement, acknowledge that they will have access to Allstate confidential information; promise not to disclose Allstate confidential information to anyone not authorized to receive it (including the EA's own employees); and confirm that they will not use Allstate confidential information for their own benefit or for any improper purpose, including, but not limited to, the solicitation of customers for another company, agent, or broker.

66107371v.1

24.     EAs agree, upon termination of their EA Agreements, to continue treating Allstate confidential information as confidential, to not disclose, either directly or indirectly, Allstate confidential information to any third party, and to immediately return all Allstate confidential information to Allstate.

25.     Hence, the information described in Paragraphs 17 and 21 is not available to the general public and is closely guarded by Allstate. Allstate keeps such information strictly confidential in order to protect its customers' privacy and to maintain a competitive advantage in the highly competitive insurance business. The time, expense, and effort that goes into the development of Allstate confidential and proprietary information is such that the independent development of identical or comparable materials by Allstate competitors would be extraordinarily difficult and expensive.

### Cruz Enters Into the EA Agreement to Solicit and Sell Allstate Products

26.     After proceeding through Allstate's rigorous screening process, Cruz became an Exclusive Agent on or about April 1, 2010. (*See* EA Agreement, a true and correct copy of which is attached as Exhibit A, at 1.)

27.     Cruz operated an Exclusive Allstate Agency from April 1, 2010 to August 26, 2020.

28.     In the regular course of its business, Allstate maintains Exclusive Agency Agreements, like the EA Agreement signed and executed by Cruz, in its files and regularly relies on those agreements.

29.     Pursuant to the EA Agreement, Allstate promised to "furnish [Cruz] such signs, forms, manuals, records, and other materials and supplies as [Allstate] deems advisable to assist

7

[Cruz]," and Cruz agreed that "all such property and information furnished by [Allstate] will remain the property of [Allstate]." (Ex. A at ¶ IV(A))

30.     Pursuant to his EA Agreement, Cruz acknowledged that the following information is Allstate "confidential information" and property:

> business plans of [Allstate]; information regarding the names, addresses, and ages of policyholders of [Allstate]; types of policies; amounts of insurance; premium amounts; the renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by [Allstate] as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of [Allstate] that is not otherwise lawfully available to the public.

(Ex. A at ¶ IV(D)).

31.     Cruz promised under his EA Agreement to maintain the confidentiality of Allstate confidential information and to return all Allstate confidential information and property to Allstate when his relationship with Allstate terminated. (*Id.* at ¶¶ IV(B)-(C), XVIII(B)).

32.     Cruz promised not to use Allstate confidential information for his own benefit and not to disclose Allstate confidential information to third parties either before or after his relationship with Allstate ended. (*Id.* at ¶¶ IV(B)).

33.     In addition, all telephone numbers used by Cruz "in connection with the business [Cruz] conducted pursuant to this [EA] Agreement are the property of [Allstate]," and, if Cruz's relationship with Allstate terminated, Cruz was required to "immediately cease [using] such telephone numbers . . . and execute an Order of Transfer of Responsibility for such numbers to [Allstate]." (*Id.* at ¶¶ IX, XVIII(C)).

34.     Similarly and if his EA Agreement terminated, Cruz was also required to stop "act[ing] or represent[ing] [himself] in any way as an agent or representative of [Allstate]," and to "immediately cease and desist from any and all use of [Allstate] service marks and trade names." (*Id.* at ¶¶ XVIII(A)(E)).

35.     Not surprisingly then, Cruz was also required to "immediately return to [Allstate] all property in [his] possession or under [his] control bearing any [Allstate] service mark or trade name." (*Id.* at ¶ XVIII(E)).

36.     Finally, Cruz promised that, for the period of one (1) year following termination of his EA Agreement, he would not solicit customers that he serviced for Allstate and/or Allstate customers whose identities he discovered through access to Allstate confidential information. (*Id.* at ¶¶ XVIII(D)(1)-(2)).

37.     Cruz recognized that a breach of any of the provisions identified in Paragraphs IV(A-E), IX, or XVIII(B) or (D) would "cause irreparable damage to [Allstate's] business and that such damage [is or will be] difficult or impossible to measure." (*Id.* at ¶¶ IV(F), XVIII(F)).

38.     Consequently, Cruz agreed that if he breached Paragraphs IV(A-E), IX, and/or XVIII(B) or (D), then "in addition to other rights and remedies," Allstate "will be immediately entitled to an order granting injunctive relief…without the necessity of posting a bond." (*Id.*)

39.     Cruz also agreed that if he breached Paragraphs IV(A-E), IX, and/or XVIII(B) or (D), then Allstate would be "entitled to an award of reasonable attorneys' fees in the event that [Allstate] is successful in an application for injunctive relief or in an action based upon breach of [one or more of those provisions]." (*Id.*)

**Cruz Breaches the EA Agreement**

9

40.     Cruz sold Allstate products from approximately April 1, 2010 to August 26, 2020.

41.     Cruz's EA Agreement, and thus his relationship with Allstate, terminated on August 26, 2020.  (A copy of the termination letter is attached as Exhibit B.)

42.     Consequently, as of August 26, 2020, Cruz was required to return all Allstate confidential information and property to Allstate. (Ex. A. at ¶¶ IV, XVIII(A)(B))

43.     Cruz was also required to transfer all telephone numbers used by Cruz while performing services under the EA Agreement to Allstate on August 26, 2020.  (*Id.* at ¶¶ IX, XVIII(C))

44.     Finally, Cruz was prohibited from soliciting Allstate customers until August 26, 2021. (Ex. A. at ¶¶ XVIII(D)(1)-(2))

45.     Unfortunately, Cruz, on August 26, 2020, refused to return Allstate confidential information to Allstate.

46.     On August 26, 2020, Cruz also refused to return Allstate property, such as signs and other materials with the Allstate logo, to Allstate.

47.     On August 26, 2020, Cruz refused to transfer the Allstate telephone number to Allstate.

48.     Allstate has demanded, on several occasions since August 26, 2020,  that Cruz return Allstate confidential information, return Allstate property, and transfer the Allstate telephone number to Allstate.

49.     For example on September 3, 2020, Allstate sent a letter to Cruz demanding that he, among other things, return Allstate confidential information, return Allstate property, and

transfer the Allstate telephone number to Allstate.  (A copy of the September 3, 2020 letter is attached as Exhibit C).

50.    Cruz failed and/or refused to respond to Allstate's September 3, 2020 letter.

51.    On September 15, 2020, Allstate attempted to remove its signage from Cruz's former Allstate Agency location (7510 US Highway 287 in Broomfield, Colorado).

52.    Cruz, on September 15, 2020, refused to allow Allstate to remove Allstate signage from his former Allstate Agency location.  Instead, Cruz threatened to call the police and sue Allstate if Allstate attempted to remove the signage and recover its property.

53.    Cruz does not have the authority to retain Allstate confidential information.

54.    Nor does Cruz have the authority to retain Allstate property or the Allstate telephone number.

55.    Nevertheless, Cruz is in possession of Allstate confidential information and property, and is now using Allstate confidential information and property to solicit Allstate customers on behalf of a competitor.

56.    Specifically, on September 30, 2020, Cruz sent a solicitation email to Allstate customers.  Cruz's solicitation email disparaged Allstate and informed the Allstate customer that Cruz is "in the process of transitioning to working as an insurance agent with my family's insurance brokerage called Colorado Premier Insurance." (A copy of Cruz's solicitation email is attached as Exhibit D).

57.    Cruz also informed the Allstate customers that he will "continue being an insurance agent with a broader range of services and multiple insurance companies," and "looked forward to talking to [the Allstate customers] soon."  (*Id.*)

58.     In other words, on September 30, 2020, Cruz informed Allstate customers that he was going to work for a competitor, and then solicited the Allstate customers to leave Allstate for his new competitive agency.

59.     Based upon information and belief, Cruz used Allstate confidential information (i.e. confidential Allstate customer contact information) for his September 30th solicitation email. Indeed, it would be impossible for Cruz to send such an email without the use of Allstate confidential information.

60.     In addition, by keeping the Allstate telephone number, Cruz can intercept calls from Allstate customers who are looking to speak with Allstate, and then solicit the Allstate customers to leave Allstate for his competitive insurance agency.

61.     Similarly, by refusing to return Allstate property, including Allstate signage for his former Allstate Agency location, Cruz is still holding himself out as an Allstate agent and is using his false affiliation with Allstate to solicit Allstate customers for his competitive agency.

62.     Cruz's misappropriation of Allstate confidential information, failure to immediately return all Allstate confidential information and property in his possession and/or control, failure to transfer the Allstate telephone, and direct customer solicitation violates the terms of Cruz's EA Agreement.

63.     Accordingly and as of this date, Cruz has failed to comply with Allstate's demands to abide by the terms of the EA Agreement, to return all Allstate confidential information and property in his possession, custody and/or control, to transfer the Allstate telephone number and to stop soliciting Allstate customers.

66107371v.1

64.     Consequently, Cruz is knowingly and intentionally ignoring the duties and obligations he owes Allstate, thereby necessitating the filing of the instant lawsuit and request for injunctive relief.

### Irreparable Harm to Allstate

65.     Cruz is harming Allstate's legitimate business interests by illegally misappropriating Allstate confidential information and property.

66.     Moreover, Allstate's confidential information and goodwill are at risk because Cruz is actively using and sharing Allstate confidential information with unauthorized third parties (*i.e.*, his new competitive agency).

67.     By failing to immediately return Allstate confidential information and property, Cruz has harmed, and continues to harm, Allstate's legitimate business interests. Cruz is also harming Allstate's legitimate business interests by illegally using Allstate confidential information to solicit Allstate customers.

68.     Furthermore, Allstate relies on its confidential information to service its clients' needs, make sure its clients are satisfied with their respective Allstate products, and sell additional products and services to its clients.

69.     If a competitor, such as Cruz, obtained and used Allstate confidential information, the competitor would be able to unfairly compete with Allstate. For example, a competitor could use Allstate confidential information to contact Allstate customers and offer those customers competing products and services based upon terms and conditions that undercut Allstate. In fact, this is already happening based upon Cruz's September 30, 2020 email.

66107371v.1

70.     This is even more true, and the harm even more severe, given that Cruz is in possession of the Allstate telephone number and refusing to return Allstate signage. Simply put, Allstate customers can call the Allstate telephone number, or stop by Cruz's former Allstate Agency location, believing that they are reaching out to an Allstate agent. Instead, the Allstate customer is actually reaching out to an Allstate competitor (Cruz) and the competitor can then solicit the Allstate customer to leave Allstate.

71.     Injury to Allstate is therefore both probable and imminent because Cruz clearly intends to continue violating his EA Agreement, improperly using Allstate confidential information and property on behalf of an Allstate competitor and using the Allstate telephone number to convert Allstate customers to an Allstate competitor.

72.     Finally, Cruz's conduct poses probable and imminent harm to Allstate customers. By continuing to possess, use, and share Allstate confidential information, Cruz can illegally access customer information and potentially share this confidential information with third parties (*i.e.* competitors and former employees) who have no right to see or possess such information.

73.     Accordingly, Allstate is suffering irreparable harm and injunctive relief is necessary and appropriate to prevent further damage to Allstate.

## COUNT I
### (Breach of Contract Against Cruz)

74.     Allstate repeats and realleges paragraphs 1 through 73 of the Complaint, as if fully set forth herein.

75.     On April 1, 2010, Cruz entered into his EA Agreement with Allstate. (*See* Ex. A.)

76.     Cruz's EA Agreement is a valid and enforceable contract.

66107371v.1

77.     Under the EA Agreement, Cruz promised, upon termination of the EA Agreement, to treat as confidential and not disclose, either directly or indirectly, Allstate confidential information to any third party.

78.     Cruz also agreed to not use any Allstate confidential information for his own benefit or for any improper purpose.

79.     Cruz specifically recognized that Allstate confidential information included:

> business plans of [Allstate]; information regarding the names, addresses, and ages of policyholders of [Allstate]; types of policies; amounts of insurance; premium amounts; the renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by [Allstate] as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of [Allstate] that is not otherwise lawfully available to the public.

(Ex. A at ¶ IV(D))

80.     Under his EA Agreement, Cruz further promised to return all Allstate confidential information and property to Allstate when his EA Agreement terminated, and transfer the Allstate telephone number to Allstate.

81.     Allstate has performed all of the duties and obligations it owes Cruz under his EA Agreement.

82.     In accordance with Paragraph XVIII(B), Allstate has demanded that Cruz return Allstate confidential information and property to Allstate. Cruz, however, has failed to do so.

83.     In accordance with Paragraph IX and XVIII(C) of the EA Agreement, Allstate has demanded that Cruz transfer the Allstate telephone number.  Cruz, however, has failed to do so.

15

84.     Instead, Cruz continues to possess and use Allstate confidential information, and continues to use the Allstate telephone number.

85.     Cruz has no right to possess or use Allstate confidential information or property following the termination of the EA Agreement.

86.     Nor does Cruz have any right to possess or use the Allstate telephone number.

87.     In addition, Cruz is prohibited from soliciting customers he serviced for Allstate, and/or Allstate customers whose identities he discovered through access to Allstate confidential information, for a period of one (1) year following termination of the EA Agreement.

88.     Cruz' EA Agreement terminated on August 26, 2020. As such, Cruz was/is prohibited from soliciting Allstate customers between August 26, 2020 and August 25, 2021.

89.     Yet, Cruz solicited (and continues to solicit) Allstate customers to leave Allstate for his new competitive insurance agency before August 25, 2021.

90.     Accordingly, Cruz is in breach of the EA Agreement.

91.     Cruz's breaches of the EA Agreement have damaged Allstate's goodwill, reputation, and legitimate business interests.

92.     Allstate is therefore entitled to recover compensatory damages and interest, in an amount to be proven at trial, for Cruz's breaches of the EA Agreement.

93.     Moreover, Cruz's breaches of the EA Agreement are continuing and ongoing, and Allstate is subject to continuing irreparable harm, economic injury, and damage to its goodwill and business reputation.

94.     In addition, Allstate needs its confidential information and property, and as well as its Allstate telephone number, in order to maintain the business relationships it has developed over

many years, protect the relationships it has developed with its customers over many years, and maintain the confidentiality of its confidential information.

95.     Allstate has no adequate remedy at law and, unless injunctive relief is granted, Allstate will continue to be irreparably harmed by Cruz in a manner that is not fully compensable by money damages. Injunctive relief is therefore necessary and appropriate in order to prevent further damage to Allstate.

96.     Hence, Allstate requests that this Court grant injunctive relief against Cruz that prohibits Cruz from: (a) using, possessing, or having access to any Allstate confidential information; (b) disclosing Allstate confidential information to anyone not authorized to receive the information; and (c) soliciting Allstate customers until after August 25, 2021.

97.     Allstate also requests that this Court order Cruz to immediately turn over all Allstate confidential information and property still in his possession, custody, or control to Allstate and to transfer the Allstate telephone number to Allstate.

98.     Finally, Allstate is entitled to recover the attorneys' fees and expenses it incurs as a result of Cruz's breach of the EA Agreement.

## <u>COUNT II</u>
**(Violation of the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.*,)**

99.     Allstate repeats and realleges Paragraphs 1 through 98 of the Complaint, as if fully set forth herein.

100.    During the course of his relationship with Allstate, Cruz was provided access to substantial amounts of Allstate confidential information, including the confidential information identified in Paragraphs 17 and 21.

101.    Allstate confidential information is not available to the general public and is closely guarded by Allstate. Allstate keeps such information strictly confidential in order to maintain a competitive advantage over competitors.

102.    Allstate confidential information is considered a "trade secret" under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.* ("DTSA"), because the information is not generally known outside of Allstate's business, the information is not generally known by employees and others involved in Allstate's business, Allstate has taken reasonable measures to guard the secrecy of the information, the information is of great value to Allstate and its competitors, Allstate invested significant amounts of time and money in developing the information, the information cannot easily be acquired or duplicated by others, and because Allstate continuously uses the information in its business.

103.    Upon termination of his EA Agreement, Cruz was required to return Allstate confidential information to Allstate but refused to do so and, upon information and belief, still retains certain Allstate confidential information in his possession and/or control.

104.    Unless restrained, Cruz will use, divulge and/or otherwise misappropriate Allstate confidential information. Indeed, upon information and belief, Cruz has disclosed Allstate confidential information and trade secrets to a direct competitor of Allstate.

105.    Cruz has used and is continuing to use Allstate confidential information in order to unfairly compete with Allstate.

106.    Cruz's continued possession and use of Allstate confidential information demonstrates that Cruz has no intention of complying with the terms of his EA Agreement or the law.

66107371v.1

107.    Naturally then, Allstate requests an order enjoining Defendants from using any Allstate confidential information, and from disclosing Allstate confidential information to anyone not authorized to receive the confidential information.

108.    Allstate also requests an order requiring Cruz to return any and all Allstate confidential information still in their possession and/or control to Allstate, and compensatory damages arising from Cruz's illegal retention and/or use of Allstate confidential information.

109.    Finally, Cruz's misappropriation of Allstate confidential information has been willful and malicious, and Allstate has incurred significant damages as a result of Cruz's misappropriation of Allstate confidential information.

110.    Cruz's actions have damaged Allstate's goodwill, reputation, and legitimate business interests.

111.    Allstate is therefore entitled to compensatory and exemplary damages in an amount to be proven at trial, as well as reasonable attorneys' fees.

### COUNT III
**(Misappropriation of Trade Secrets in Violation of the Colorado Trade Secrets Act, Colorado Revised Statute §§ 7-74-101 et seq.,)**

112.    Allstate repeats and realleges paragraphs 1 through 111 of the Complaint as if fully set forth herein.

113.    During the course of his relationship with Allstate, Cruz was exposed to substantial amounts of Allstate trade secrets and confidential information.

114.    For example, Cruz was provided access to:  Allstate business plans; information regarding the names, addresses, and ages of policyholders or prospective policyholders of Allstate; types of policies; amounts of insurance; premium amounts; the description and location of insured

property; the expiration or renewal dates of policies; policyholder listings; policyholder information that is subject to privacy law; claim information; customer contact information; customer account numbers; and customer account values.

115.    This information is not available to the general public and is closely guarded by Allstate. Allstate keeps such information strictly confidential in order to protect its customers' privacy and in order to maintain a competitive advantage in the highly competitive insurance business.

116.    The information identified in Paragraphs 17 and 21 is considered a "trade secret" under Colorado Revised Statute, §§ 7-74-101 *et seq.*, because the information is not generally known outside of Allstate's business, the information is not generally known by employees and others involved in Allstate's business, Allstate has taken reasonable measures to guard the secrecy of the information, the information is of great value to Allstate and its competitors, Allstate invested significant amounts of time and money in developing the information, the information cannot easily be acquired or duplicated by others, and Allstate continuously uses the information in its business.

117.    Upon termination of his EA Agreement, Cruz was required to return Allstate confidential information to Allstate but refused to do so and still retains certain Allstate confidential information in his possession, custody and/or control.

118.    Unless restrained, Cruz will use, divulge, inevitably disclose, and/or otherwise misappropriate Allstate confidential information. Indeed, Cruz has already disclosed Allstate confidential information and trade secrets to a direct competitor of Allstate.

66107371v.1

119.     Cruz has used and is continuing to use Allstate confidential information in order to unfairly compete with Allstate.

120.     Cruz's continued possession and use of Allstate confidential information demonstrates that Cruz has no intention of complying with the terms of his EA Agreement or the law.

121.     Naturally then, Allstate requests an order enjoining Cruz from using any Allstate confidential information, and from disclosing Allstate confidential information to anyone not authorized to receive the confidential information.

122.     Allstate also requests an order requiring Cruz to return any and all Allstate confidential information still in his possession and/or control to Allstate, as well as compensatory damages arising from Cruz's illegal retention and/or use of Allstate confidential information.

123.     Finally, Cruz's misappropriation of Allstate confidential information has been willful and malicious, and Allstate has incurred significant damages as a result of Cruz's misappropriation of Allstate confidential information.

124.     Cruz's actions have damaged Allstate's goodwill, reputation, and legitimate business interests.

125.     Allstate is therefore entitled to compensatory and exemplary damages in an amount to be proven at trial, as well as reasonable attorneys' fees.

WHEREFORE, Plaintiff Allstate Insurance Company respectfully requests that this Court:

1.     Enter an injunction enjoining and restraining Cruz, and his agents, representatives, servants, employees, and all those acting in concert or participation with him, from using, possessing, disclosing, or having access to any Allstate confidential information;

21

2.      Enter an order requiring Cruz to return all Allstate confidential information and property in his possession, custody or control to Allstate;

3.      Enter an order requiring Cruz to transfer all telephone numbers used by Cruz while affiliated with Allstate to Allstate;

4.      Enter an injunction enjoining and restraining Cruz, and anyone acting in concert or participation with him, from directly or indirectly soliciting Allstate customers until after August 25, 2021;

5.      Enter judgment against Cruz for compensatory damages in an amount to be determined at trial;

6.      Enter judgment against Cruz for exemplary damages in an amount to be determined at trial;

7.      Award Allstate the costs and expenses, including the reasonable attorneys' fees, Allstate incurs as a result of Cruz's breach of his EA Agreement and misappropriation of Allstate trade secrets; and

8.      Award Allstate such other relief as the Court may deem just and proper.

DATED: October 20, 2020              Respectfully submitted,

/s/ *Sara Eber Fowler*
Sara Eber Fowler
J. Scott Humphrey (to be admitted *pro hac vice*)
Besma (Bessie) Fakhri (to be admitted *pro hac vice*)
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, IL 60606-6448
Tel:  (312) 460-5000
Fax: (312) 460-7000
sfowler@seyfarth.com
shumphrey@seyfarth.com
bfakhri@seyfarth.com

*Counsel for Plaintiff Allstate Insurance Company*

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Elise Teague, on behalf of Plaintiff Allstate Insurance

Company, verify under penalty of perjury that the foregoing statements in Allstate Insurance

Company's Verified Amended Complaint are true and correct to the best of my knowledge,

information and belief.

_____
Elise Teague

Dated: October ___, 2020

# EXHIBIT 2

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLORADO

ALLSTATE INSURANCE COMPANY,

                Plaintiff,

      v.

JOHN CRUZ and PIP PERSONAL
IDENTITY PROTECTION LLC,

              Defendants.

Civil Action No. 1:24-cv-933

**JURY TRIAL DEMAND**

### COMPLAINT

Plaintiff Allstate Insurance Company ("Allstate"), by and through its attorneys, brings this Complaint against Defendants John Cruz ("Cruz") and PIP Personal Identity Protection LLC (the "LLC") (Cruz and the LLC, jointly "Defendants") and states as follows:

### INTRODUCTION

1.      After months of litigation against Cruz for breaching his Allstate Exclusive Independent Contractor Agreement and stealing its trade secrets, Allstate thought its interactions with former Allstate Exclusive Agent[1] John Cruz were over. But in late March 2024—less than a month after that case concluded—to its shock and horror, Allstate learned that Cruz and his LLC are now harassing Allstate through a smear campaign. Specifically, Defendants are broadcasting false claims that Allstate is selling its customers' sensitive information to, among other things, further criminal activity.

---

[1] Allstate enters into agreements with independent contractors, referred to as "Exclusive Agents," who then sell Allstate insurance products.

1

2.     Defendants are publishing their false lies through at least two websites (www.savemepip.com and www.pip-personalidentityprotection.com) and four social media accounts (Facebook, LinkedIn, Instagram, and YouTube).

3.     Defendants' websites falsely claim that Allstate and its "subsidiary companies" "leaked" sensitive and personal customer information (name, social security number, date of birth, and drivers' license).[2] These claims are blatantly false: a simple review of Allstate's published privacy policy clearly states that Allstate does not sell any sensitive personal information for any purpose. *See* ALLSTATE INS. CO., Allstate Online Privacy Statement (effective Mar. 7, 2024), available at https://www.allstate.com/privacy-center/aic-privacy-statement

4.     One of Defendants' websites also states that "Allstate representatives have stated under oath in Federal court, [that] Allstate representatives are allowed to refer/share/transfer your personal information to anyone."[3] Again, this claim is blatantly false.

5.     Both websites contain videos accusing Allstate of selling its customers' personal information in exchange for gift cards used in furtherance of human trafficking, sex trafficking, and rape. In this way, the websites indicate that Allstate has (i) breached the trust of millions of its customers; and (ii) engaged in wrongful or criminal behavior.

6.     Additionally, Defendants have posted excerpts from the confidential depositions of Allstate employees in Allstate's case against Cruz[4]—in violation of the protective order in that case—on Defendants' websites.

---

[2]  *See* https://savemepip.com/about-us-2/ (last accessed Mar. 28, 2024); https://www.pip-personalidentityprotection.com/background (last accessed Mar. 28, 2024).

[3]  https://www.pip-personalidentityprotection.com/background.

[4]  *Allstate Ins. Co. v. John Cruz,* Case No. 20-cv-03139-DDD-MEH (D. Colo.) (The "Allstate Lawsuit").

7.     And perhaps even more disturbing, <u>Defendants have placed advertisements on CNN and MSNBC with these false statements in order to drive traffic to those websites</u>. Defendants have also created Instagram pages for the false statements and posted about the false statements on LinkedIn, Facebook, and YouTube.

8.     Defendants' allegations that Allstate is stealing its customer information to further criminal activity is false. Allstate's privacy policy states that it does not sell customer information, and Allstate is not otherwise engaged in criminal or fraudulent activity.

9.     Defendants know that these statements are false. Cruz made these same false allegations in the Allstate Lawsuit and did not provide any evidence to support his claims. Further, in its summary judgment ruling, the Court explicitly found that Allstate takes steps to protect its customers' information, and that "any sharing of customer information, including contact information…is only done with the customer's consent." (ECF No. 221 at 18). Cruz later agreed to dismiss all claims with prejudice, further acknowledging their falsity.

10.     Thus, out of spite and vengeance, Cruz, independently and through his LLC, aims to inflict as much harm on Allstate as possible through once again spreading false lies about Allstate. Given that Cruz will clearly not stop his smear campaign absent Court intervention, Allstate has no choice but to file this suit against Defendants for (1) Defamation and (2) Violation of the Colorado Deceptive Trade Practices Act (C.R.S. § 6-1-101, et seq).

11.     In doing so, Allstate asks that this Court, in addition to awarding Allstate compensatory damages, punitive damages and attorneys' fees, to enter an order a) requiring Defendants to immediately retract and remove any and all false and defamatory statements concerning Allstate on their websites and social media platforms and b) enjoining Defendants from making further defamatory statements.

3

12.     Immediate injunctive relief is required because Defendants' false statements continue to harm Allstate. There can be no question that if the statements on their websites and social media account are not removed, they will cause harm to Allstate's reputation and goodwill. Further, Cruz is set to start a criminal trial on April 29, 2024 for sixteen counts relating to theft, forgery, and identity theft. Should Cruz be convicted and incarcerated, he may no longer have access to the websites or social media accounts, and as a result, Allstate may not be able to shut down the websites.

## PARTIES

13.     Plaintiff Allstate is an Illinois corporation with its principal place of business in Northbrook, Illinois.

14.     Defendant John Cruz is a citizen of the State of Colorado and resides in Longmont, Colorado.

15.     Defendant Pip Personal Identity Protection LLC is a Colorado company with its principal place of business at 1130 Francis Street, Suite 7006, Longmont, Colorado 80501. Upon information and belief, Pip Personal Identity Protection LLC has two members: Defendant John Cruz and his wife, Denise Cruz. Both John Cruz and Denise Cruz are residents of Longmont, Colorado.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to Article VI, Section 9 of the Colorado Constitution (giving federal district courts general jurisdiction in Colorado for all civil cases); C.R.S. § 13-1-124 (Colorado's long arm statute); and 28 U.S.C. § 1332(a), because this action and controversy is between citizens of different states and exceeds the value of $75,000 exclusive of interest and costs.

17.     This Court has personal jurisdiction over Cruz because Cruz is a citizen and resident of the State of Colorado, and, pursuant to C.R.S. § 13-1-124, because Cruz transacts business in Colorado and committed tortious acts against Allstate in Colorado.

18.     Likewise, this Court has personal jurisdiction over the LLC because it is a citizen of the State of Colorado, and, pursuant to C.R.S. § 13-1-124, because it transacts business in Colorado and committed tortious acts against Allstate in Colorado.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

### Allstate's Previous Litigation with Cruz

20.     Cruz is a former Allstate Exclusive Agent who sold Allstate products from 2011 to 2020 under an Allstate Exclusive Agent Agreement ("Agreement"). Under the terms of the Agreement, Cruz could not sell insurance products that competed with products sold by Allstate. In October 2019, an internal Allstate investigation revealed that Cruz was selling insurance products that competed with Allstate products, despite being barred from doing so by the Agreement. As a result, Allstate terminated Cruz's Agreement and relationship with Allstate.

21.     Following the termination of Cruz's Agreement, Cruz continued to solicit business from Allstate customers and otherwise violate the surviving terms of the Agreement.

22.     Consequently, on October 20, 2020, Allstate filed suit against Cruz for breach of the Agreement and misappropriation of trade secrets. Cruz filed counterclaims against Allstate for a variety of unsubstantiated claims. In support of his counterclaims, Cruz repeatedly alleged that Allstate sold personal customer information to third parties, even though there was simply no evidence to support these claims.

23.     The parties engaged in written discovery and took several depositions. On February 24, 2021, this Court entered a Protective Order to facilitate the discovery process. *See Allstate Ins. Co. v. Cruz,* Case No. 20-cv-03139-DDD-MEH (D. Colo.) at ECF No. 55. Paragraph 2 of the Protective Order defines Confidential Information as "any document, electronically stored information, testimony, or response to a discovery request, including any extract, abstract, chart, summary, note, or copy made therefrom—not made available to the public—and designated by one of the Parties in the manner provided below as containing: customer information, information that implicates common law and/or statutory privacy interests; competitive business information or information that a party believes is otherwise entitled to protection." *Id.* at ¶ 2. Paragraph 6 of the Protective Order prohibits the disclosure of Confidential Information to anyone other than attorneys working on the Case, the Parties, the Court, and other persons by written agreement. *Id.* at ¶ 6. Further, Paragraph 9 of the Protective Order requires the return or destruction of Confidential Information upon the conclusion of the Case. *Id.* at ¶ 9. Throughout the course of discovery, Allstate marked several documents and transcripts Confidential pursuant to the terms of the Protective Order, including the deposition transcripts of "Buyer Depot,"[5] Richard Poduska, Elise Teague, Erika Lousberg, Jodi Lynch, Dino DiCarlo, and Rebecca Martens.

24.     During the course of discovery, Cruz provided no evidence to support his claims that Allstate sold personal customer information to third parties.

25.     Both parties moved for summary judgment on Allstate's breach of contract claim and all of Cruz's counterclaims. *See Allstate Ins. Co. v. Cruz,* Case No. 20-cv-03139-DDD-MEH

---

[5] Allstate notes that this partial deposition transcript is listed as "Buyer Depot" on Cruz's websites, but the deponent indicated therein is listed simply as "Buyer." Allstate is unable to glean the identity of the deponent from Cruz's websites, but states that the first page of the partial deposition transcript clearly references the case number for this action.

(D. Colo.) at ECF Nos. 191, 196.[6] This Court referred these motions to the Honorable Michael Hagerty, who issued his Recommendations on April 14, 2023. *Id.* at ECF Nos. 200, 221. Judge Hagerty recommended granting Allstate's motion and denying Cruz's motion. *Id.* at ECF No. 221. Cruz filed his Objections to that Recommendation on May 23, 2023, and Allstate responded on June 6, 2023. *Id.* at ECF Nos. 231, 233.

26.     On September 20, 2023, this Court adopted the Recommendation and granted Allstate's motion for summary judgment on all of Cruz's counterclaims and otherwise denied Cruz's request for summary judgment on those counts. *Id.* at ECF No. 236 (pp. 8–9). The Court also granted Allstate's motion for summary judgment on its breach of contract claim as to liability. *Id.* In its Order, the Court noted that "it is undisputed that Cruz violated the post-termination restrictive covenants at issue, including by competing with Allstate from the same location he used as an [Allstate Exclusive Agent] and soliciting its customers." *Id.* at 7.

27.     The Court also pointed out the complete lack of evidence offered by Cruz in support of any of his counterclaims, emphasizing how Cruz's claims rely "on conclusory and self-serving statements and fail[] to address Allstate's arguments or make the showings required by applicable law." *Id*. at 8.

28.     After the summary judgment ruling, Cruz repeatedly stated that he planned to appeal the summary judgment ruling.

29.     Yet, on March 5, 2024, the parties attended a status conference with the Court. During that conference, Cruz represented that he no longer intended to appeal the Court's summary judgment ruling. He further stated that he was willing to dismiss his claims. In response, Allstate

---

[6] Neither Allstate nor Cruz moved for summary judgment on Allstate's trade secrets claims. *See* Dkt. 236 ("Neither of the Parties motions seek summary judgment with respect to Allstate's trade secret claims.")

agreed to dismiss its remaining trade secrets claims. With the guidance of the Court, the parties

agreed to stipulate to a dismissal of all claims with prejudice *Allstate Ins. Co. v. Cruz,* Case No.

20-cv-03139-DDD-MEH (D. Colo.) at ECF No. 272. Accordingly, this Court dismissed all claims

with prejudice and terminated the Case on March 5. *Id.* at ECF No. 271. The Court also stated on

the record that the only comment that either Cruz or Allstate could make about the case was that

the parties "resolved [their] differences and [] agreed to [] dismiss the case." *Id.* at Transcript,

March 5 Proceeding. Accordingly, "both parties agree[d] to dismiss all claims that were or could

have been brought in this lawsuit with prejudice." *Id.*

### Cruz Defames Allstate and Publishes Confidential Transcripts from the Allstate Lawsuit in Violation of the Protective Order

30.     According to records filed with the Colorado Secretary of State, Cruz formed his

LLC on October 26, 2023—one month after the Court issued its Order in favor of Allstate in the

Allstate Lawsuit.

31.     Cruz never disclosed the existence of his LLC to either Allstate or the Court. Nor

did he inform Allstate or the Court of his plan to exact revenge on Allstate as a result of losing the

summary ruling.

32.     In late March 2024, Allstate discovered that Cruz had created  two websites

advertising his LLC's identity protection "services": www.savemepip.com and www.pip-

personalidentityprotection.com. The websites purport to sell identity theft protection services, but

that façade belies a more sinister purpose. **Both websites prominently display false and**

**defamatory claims about Allstate: namely, that Allstate has exposed the sensitive personal**

**information of its customers.**

***Figure 1***: "Background" page at www.pip-personalidentityprotection.com/background (last accessed Mar. 28, 2024).

33. Both websites are owned and operated by Cruz. The phone number listed on the website is affiliated with the location of Cruz's former Allstate Agency location. Additionally, the fact that the websites contain excerpts of the confidential deposition transcripts from the Allstate lawsuit—transcripts that only the parties to the lawsuit would have access to—provides further evidence of Cruz's involvement, ownership, and defamatory scheme.

34. Both websites shift between selling an unidentifiable "24/7 monitoring" identity protection service and defaming Allstate. For example, on the www.savemepip.com website, the Home Page includes applications to "safeguard your future" that links to an affiliate page with third-party identity protection service LegalShield, https://personal75.wearelegalshield.com/. Under LegalShield's affiliate program, Defendants earn a commission on every LegalShield plan he sells through his website. Just underneath the application, the website reads:



**_Figure 2_**: "Home" page at www.savemepip.com (last accessed Mar. 28, 2024).

35.    In conjunction with their false and defamatory statements about Allstate on their websites, Defendants have posted no less than seven excerpts from confidential depositions in the Allstate Lawsuit, including depositions of Allstate personnel. This is a reckless and blatant violation of the Protective Order in that matter, which prohibits Cruz from disclosing confidential information from the lawsuit and requires Cruz to return or destroy all confidential information upon the conclusion of the Allstate Lawsuit.



***Figure 3***: "Home" page at www.savemepip.com (last accessed Mar. 28, 2024).



**Figure 4**: "Home" page at https://pip-personalidentityprotection.com/ (last accessed March 29, 2024)

36.     Just as important, none of the deposition transcripts published by Defendants support any of the defamatory statements Defendants make against Allstate.

37.     In addition, Defendants make at least nine false and defamatory statements about Allstate on https://savemepip.com/:

a.     The homepage and "Protect yourself" pages of https://savemepip.com/ contain a video stating that consumers who "checked Allstate for insurance" or "purchased an extended warranty from Allstate" have had their sensitive personal information stolen. The video further claims that "Allstate has testified that Allstate sells your personal information to anyone for gift cards. Your name, social security, date of

12

birth, drivers license. You are not in good hands. You need personal identity protection."

b.     The homepage and "About Us" pages of https://savemepip.com/ state: "Why we began. Anyone who got a warranty from[.] PIP-Personal Identity Protection was created to protect the Identity of anyone who gave Allstate Insurance Company their personal information. Name, Social Security Number, Date of Birth, Drivers License. Anyone who gave their personal information to any of Allstate subsidiary companies[.]" The website then displays the logos of companies including eBay, Sam's Club, Home Depot, and more.

c.     The homepage and "About Us" pages of https://savemepip.com/ state: "Allstate representatives have stated under oath in Federal Court[.] Depositions of Allstate Representatives, Allstate Executives are on PIP-Personal Identity Protection. Allstate representatives only need to follow three (3) rules[.]" On the homepage Defendants display the graphic that appears in **Figure 2**, above. On the "About Us" page, they created a different defamatory graphic using the same language.

d.     The "About Us" page of https://savemepip.com/ states: "About Us[,] Why We Began[.] PIP-Personal Identity Protection was created to protect the Identity of anyone who gave Allstate Insurance Company their personal information. Name, Social Security Number, Date of Birth, Drivers License. Anyone who gave their personal information to any of Allstate subsidiary companies[.]"

e.     At the top of the "Protect Yourself" page of https://savemepip.com/, the website states "Watch how ALLSTATE plays an important role with your identity theft."

13

The website then contains six animated videos created by Defendants, five of which explicitly defame Allstate.

  i.  The first video falsely states: "***Meet John, an unwitting Allstate customer. His personal details, name, social security number, birthdate, address were traded for gift cards***. Visa, Mastercard, American Express, and Target. ***John's life was traded for gift cards***. Armed with John's information, the culprit went further, discovering where he worked and his income. They applied for credit cards and secured new car loans, eventually selling the cars for parts. Days later, ***John's world crumbled***. His credit score tanked, and he realized his identity was used for fraud. The credit cards remained unpaid, leaving John with the consequences. Destroyed credit, unpaid debts, and a life in disarray."

  ii.  The second video falsely states: "Meet John. Intent on gifting his wife a Costco washer and dryer ***with an Allstate warranty***. Little did he know ***this decision would spiral into chao***s. ***With trust, John shared personal details on Allstate's site for the warranty. Unbeknownst to him, his info was traded for gift cards,*** leading to false speeding accusations. Another man gets pulled over by police for speeding. He has an authenticated driver's license, which was actually ***John's personal information bought from Allstate by giving gift cards***. After vacation, he discovered his compromised identity caused legal trouble by being arrested for three major speeding tickets. ***Allstate's careless data handling shattered trust***. Sadly, ***Allstate refers, shares and transfers your identity to anyone paid with gift cards. This is what can happen to you when getting insurance from Allstate.*** Keep safe. Keep Happy."

14

         iii.     The third video falsely states: "In a chilling tale of identity theft and its devastating consequences, a seemingly innocent transaction that *Allstate turns into a tragic human trafficking scheme*." The video claims that nefarious actors can purchase "personal information (names, addresses, social security numbers, and driver's license details" with "gift cards." The narrative continues, "a father in dire need seeking asylum for his wife (47) and daughter (13) finds his hopes shattered… *His wife and daughter were beaten, raped, murdered*. Only through the purchased identities were they identified; their lives taken for a few thousand dollars. As authorities trace back confronting a man who claims missed family, the truth emerges. *Allstate's negligence in safeguarding customers' data, refusing accountability, is a betrayal of trust. Their silence leaves lives shattered*. *A stark reminder of the grave consequences of unchecked information sharing*."

         iv.     The fourth video again connects Allstate to human trafficking and rape, falsely claiming that "*Allstate refers, shares and transfers identities to anyone*," including a sex trafficker who impregnated a missing child and used stolen identities purchased from Allstate to continue his criminal activity.

         v.     The fifth video also appears on the homepage of https://savemepip.com/. It falsely claims that consumers who have "*checked Allstate for insurance*" or "*purchased an extended warranty from Allstate*" have had their sensitive personal information stolen. The video claims that "*Allstate has testified that Allstate sells your personal information to anyone for gift cards. Your name, social security, date of birth, drivers license. You are not in good hands.* You need personal identity protection."

38.    Defendants' second website, https://pip-personalidentityprotection.com, makes nearly identical false and defamatory accusations against Allstate:

a.    Like https://savemepip.com/, the "Background" page of https://pip-personalidentityprotection.com falsely states: "Why We Began[.] PIP-Personal Identity Protection was created to protect the Identity of anyone who gave Allstate Insurance Company their personal information. Name, Social Security Number, Date of Birth, Drivers License. Anyone who gave their personal information to any of Allstate subsidiarity companies:" Defendants then display graphics of several of Allstate subsidiaries, as well as companies such as Costco and Walmart. This section of the website also includes a hyperlink to a document that lists every subsidiary of Allstate.

b.    The "Background" page of https://pip-personalidentityprotection.com also states that "Allstate representatives have stated under oath in Federal Court, Allstate representatives are allowed to refer/share/transfer your personal information to anyone." The website then directs visitors to the "Homepage," which contains excerpts of the confidential depositions taken in the Allstate Lawsuit against Cruz.

c.    The top of the "Protect Yourself" page of https://pip-personalidentityprotection.com, states "Watch how ALLSTATE plays an important role with your **identity theft**" (emphasis in original).  It then contains four of the five defamatory videos described above. Specifically:

i.    The first video falsely states: "Meet John. Intent on gifting his wife a Costco washer and dryer with an Allstate warranty. Little did he know this decision would spiral into chaos. ***With trust, John shared***

16

personal details on Allstate's site for the warranty. Unbeknownst to him his info was traded for gift cards, leading to false speeding accusations. Another man gets pulled over by police for speeding. He has authenticated driver's license which was actually John's personal information bought from Allstate by giving gift cards. After vacation, he discovered his compromised identity caused legal trouble by being arrested for three major speeding tickets. Allstate's careless data handling shattered trust. Sadly, Allstate refers, shares and transfers your identity to anyone paid with gift cards. This is what can happen to you when getting insurance from Allstate. Keep safe. Keep Happy."

      ii.     The second video falsely states: "Meet John, an unwitting Allstate customer. His personal details, name, social security number, birthdate, address were traded for gift cards. Visa, Mastercard, American Express, and Target. John's life was traded for gift cards. Armed with John's information, the culprit went further, discovering where he worked and his income. They applied for credit cards and secured new car loans eventually selling the cars for parts. Days later, John's world crumbled. His credit score tanked and he realized his identity was used for fraud. The credit cards remained unpaid, leaving John with the consequences. Destroyed credit, unpaid debts, and a life in disarray."

      iii.     The third video falsely states: "In a chilling tale of identity theft and its devastating consequences, a seemingly innocent transaction that Allstate turns into a tragic human trafficking scheme." The video

claims that nefarious actors can purchase "personal information (names, addresses, social security numbers, and drivers license details" with "gift cards." The narrative continues, "a father in dire need seeking asylum for his wife (47) and daughter (13) finds his hopes shattered… His wife and daughter were beaten, raped, murdered. Only through the purchased identities were they identified; their lives taken for a few thousand dollars. As authorities trace back confronting a man who claims missed family, the truth emerges. ***Allstate's negligence in safeguarding customers' data, refusing accountability, is a betrayal of trust. Their silence leaves lives shattered***. ***A stark reminder of the grave consequences of unchecked information sharing***."

       iv.    The fourth video again connects Allstate to human trafficking and rape, falsely claiming that "***Allstate refers, shares and transfers identities to anyone***," including a sex trafficker who impregnated a missing child and used stolen identities purchased from Allstate to continue his criminal activity.

39.    All of Defendants' claims about Allstate are false and defamatory *per se*. They wrongfully assert that Allstate has stolen valuable and sensitive information from all of its customers, sold that information to criminals, and enabled schemes of human trafficking.

40.    Likewise, the statements on https://savemepip.com/ and https://pip-personalidentityprotection.com falsely assert that Allstate engages in criminal and fraudulent activity. These allegations necessarily impugn Allstate's trustworthiness.

**Defendants Defame Allstate on Social Media**

41.     In February 2024 and unbeknownst to Allstate, Defendants began spreading their defamatory messages on LinkedIn, on Instagram, on Facebook, and on YouTube. As of the date of this Complaint, Cruz has posted eight defamatory posts on LinkedIn claiming that Allstate sells its customers' sensitive personal financial information for gift cards. Several of these LinkedIn posts also prominently display the defamatory videos (*see supra* ¶¶ 37.e), 38.c)) and/or link to https://savemepip.com/ and https://pip-personalidentityprotection.com.



***Figure 4***: Cruz's Defamatory LinkedIn Post from February 2024.

42.     Defendants also created a Facebook page called "PIP – Personal Identity Protection," where he has been publishing defamatory Facebook posts, the above-mentioned videos, and links to his defamatory websites. As of the filing of this Complaint, Defendants have

posted at least three Facebook posts explicitly mentioning Allstate in writing or via video. They have posted many more that link to his defamatory websites.



***Figure 5***: Defendants' Defamatory Facebook Post from March 2024.

43.     Defendants have also turned to YouTube to further spread their lies about Allstate. Specifically, Defendants have posted at least one of the defamatory videos published across their websites to Cruz's YouTube channel.[7]

---

[7] *See https://www.youtube.com/watch?v=A6IF0AJLhwg&t=6s* (last accessed April 5, 2024).



*__Figure 6__*: Cruz's Defamatory YouTube Post from February 2024.

44.     Defendants have not stopped at LinkedIn, Facebook, and YouTube. In an effort to cause as much harm and widespread damage to Allstate as possible, Defendants also created an Instagram account where, since February 2024, they have posted at least four defamatory Instagram posts about Allstate. Their page, "PIP – Personal Identity Protection," is labeled as a "legal" organization. Defendants have posted many more Instagram posts to this page that link to their defamatory websites.



***Figure 7:*** Defendants' defamatory Instagram page.

**Defendants Defame Allstate on CNN and MSNBC**

45.    Upon information and belief, in March of 2024 and unbeknownst to Allstate, Defendants began advertising their defamatory websites on cable news networks and popular news websites. Specifically, Defendants purchased ad slots through local affiliates for linear programming on CNN and MSNBC, as well as advertising on CNN's website.

46.     Specifically, upon information and belief, Defendants purchased ad space through Coventry First, LLC, resulting in advertising for one of their websites being aired on MSNBC in the Chicago market at 11:54 a.m. local time on Thursday, March 28, 2024. That ad directed viewers to https://savemepip.com/.

47.     Upon information and belief, the same advertisement aired on CNN's local affiliate in the Chicago market around the same timeframe. The advertisement was also published on CNN's website.

48.     The purpose of advertising Defendants' websites on CNN and MSNBC was to drive traffic to their websites and ensure that as many people as possible heard their defamatory statements. Another purpose was to cause as much harm to Allstate as possible.

### Defendants' Statements about Allstate Are False

49.     Each and every statement Defendants have made about Allstate is false.

50.     Defendants have stated that Allstate sells its customers' personal information, including their name, social security number, date of birth, and driver's license information. That is not true. Allstate does not sell its customers' personal information, as explained in its publicly available privacy policy on their website: https://www.allstate.com/privacy-center. The website specifically states, "As a simple fact, we do not sell your personal information." Allstate also has a separate "privacy statement" on their website explaining in detail where each customers' personal information goes: https://www.allstate.com/privacy-center/aic-privacy-statement. Allstate does not sell its customers' personal information.

51.     Defendants have stated that Allstate sells its customers' personal information for gift cards, and that Allstate "trades" customers' personal information for gift cards. That is not true. Allstate does not sell its customers' personal information at all, as explained in its publicly

available privacy policy on the Allstate website: https://www.allstate.com/privacy-center. The website specifically says, "As a simple fact, we do not sell your personal information." Allstate also has a separate "privacy statement" on its website explaining in detail where each customers' personal information goes: https://www.allstate.com/privacy-center/aic-privacy-statement. Allstate does not sell its customers' personal information for gift cards.

52.     Defendants have stated that Allstate representatives "need to follow three (3) rules." The first "rule" is to "use Allstate electronic communication, email, phone, fax. Used to transfer your personal information." This statement insinuates that Allstate is not careful or protective of its customers' sensitive personal information, and/or that Allstate does not follow all applicable data privacy laws. That is not true. Allstate's publicly available privacy statement enumerates the ways that Allstate uses its customers' personal information: https://www.allstate.com/privacy-center/aic-privacy-statement. Allstate does not use unchecked or electronic communication to transfer its customers' sensitive personal information. Allstate follows all applicable data privacy laws regarding the care and transfer of its customers' sensitive personal information.

53.     Defendants have stated that the "second rule" that Allstate representatives "need to follow" is that they are "not allowed to report to any government agency." That is not true. Allstate's publicly available privacy statement explains that Allstate "limit[s] access to your personal information to those who need it to do their jobs," and "compl[ies] with all applicable federal and state data security laws." (https://www.allstate.com/privacy-center/aic-privacy-statement). Allstate reports to applicable government agencies as required by law.

54.     Defendants have stated that the "third rule" that Allstate representatives "need to follow" is that the "only form of payment allowed to be paid to Allstate representatives" are "Gift

Cards." That is not true. That statement has no basis in reality. Allstate abides by all state and federal laws.

55.     Defendants have stated that Allstate engages in "careless data handling." That is not true. Allstate's publicly available privacy statement explains that Allstate "compl[ies] with all applicable federal and state data security laws." (https://www.allstate.com/privacy-center/aic-privacy-statement). Allstate handles data carefully, as required by law.

56.     Defendants have stated that Allstate has engaged in a "human trafficking scheme." That is not true, and the statement has no basis in reality. Allstate abides by all state and federal laws, including criminal laws, and is not involved in criminal activity regarding human trafficking.

57.     Defendants have stated that Allstate is "negligent in safeguarding customers' data" and has been "refusing accountability" with its "unchecked information sharing." That is not true. Allstate's publicly available privacy statement explains that Allstate "compl[ies] with all applicable federal and state data security laws." (https://www.allstate.com/privacy-center/aic-privacy-statement). Allstate handles data carefully, as required by law.

**Defendants Published their Statements about Allstate with Actual Malice**

58.     As set forth above, Defendants' statements about Allstate are unquestionably false. What's more, Defendants *knows* that they are false, but has published them anyway. Their knowingly false publication of statements accusing Allstate of being involved with sex trafficking is intended to harm Allstate's reputation. Indeed, Defendants' actual malice manifests itself in at least five different ways.

59.     Defendants knows that their statements about Allstate are false due to the fact that no evidence was produced in the Allstate Lawsuit to support these statements.

60.     The Court's summary judgment findings in the Allstate Lawsuit also show that Defendants knows their statements are false. In the Court's summary judgment recommendation, Magistrate Judge Hegarty held that the "uncontroverted record evidence shows that [Allstate] takes steps to protect" the names and contact information of its customers, "including educating" its agents "about protecting confidential information, keeping its databases password protected and only accessible on a need to know basis, having its [agents] and the [agents'] employees sign agreements which have confidentiality obligations, and putting in place safeguards to alert Allstate if confidential information is being improperly sent outside the systems." (ECF No. 221 at 18). The court additionally stated, "**Any sharing of customer information, including contact information, with a referral to an outside agency, is only done with the customer's consent**." (*Id.*)

61.     Furthermore, Defendants knows that their statements about Allstate are false from Allstate's publicly available privacy policy (https://www.allstate.com/privacy-center/aic-privacy-statement), which states that Allstate "compl[ies] with all applicable federal and state data security laws."

62.     Defendants also knows that their statements about Allstate are false from Allstate's publicly available website (https://www.allstate.com/privacy-center), which specifically states, "As a simple fact, we do not sell your personal information."

63.     Defendants knows that their statements about Allstate are false because they manipulated deposition transcripts that Cruz was given under the Protective Order in the Allstate Lawsuit, publicly posted them online, and used them as "evidence" to "support" his their position that Allstate sells customers' sensitive personal information in exchange for gift cards.

64.     As noted above, none of the depositions, including the deposition transcripts publicly posted by Defendants, from the Allstate Lawsuit support Defendants' claims.

65.     Specifically, none of the Allstate representatives or executives testified that Allstate sells its customers' sensitive personal information. None of the Allstate representatives or executives testified that Allstate sells its customers' sensitive personal information in exchange for gift cards. None of the Allstate representatives or executives testified that Allstate is involved in sex trafficking. None of the Allstate representatives or executives testified that Allstate violates data privacy laws or otherwise does not follow laws and regulations.

66.     Defendants knows that their statements about Allstate are false, but they chose to publish them anyway because they harbor ill will and a desire to harm Allstate. Cruz lost the previous lawsuit against Allstate at summary judgment and settled out of court. Upon information and belief, Cruz was angry with Allstate and desired vengeance. Cruz was acting out of spite and ill will when he published, both independently and through his LLC, the defamatory statements about Allstate.

67.     Defendants knows that their statements about Allstate are false, but they chose to publish them anyway in order to advance their own personal financial position and compete with Allstate. Defendants desires to sell insurance in competition with Allstate via LegalShield. The landing page of each of Defendants' defamatory websites contain links to an "application." Those "application" links re-direct a person to https://personal75.wearelegalshield.com/, a website that sells "protection for your family, your business & your personal identity." Defendants defame Allstate while simultaneously promoting his own insurance sales on LegalShield in order to garner more business for himself. Hence, Defendants are acting with a commercial purpose.

27

68.     Defendants acted (and are acting) with actual malice. They know that all of the statements they made about Allstate are false for three reasons. First, there are public court documents from litigation Cruz was a party to explaining that his claims about Allstate are false. Second, there are publicly available websites showing that Defendants' claims about Allstate are false. Third, Cruz has a motive to harm Allstate because of the prior litigation, and because he is competing with Allstate.

69.      Defendants' publication of these false statements has caused and will continue to cause Allstate to suffer irreparable harm. Specifically, Allstate enjoys a strong reputation with its customers and the public at large. It has invested millions of dollars in advertising and brand awareness. Its reputation and brand are one of Allstate's most valuable assets. The false statements on Defendants' websites, which they are also promoting on social media, are causing harm to that reputation and brand. What's more, the ongoing harm from those statements is difficult to measure because it proliferates as it gets picked up by other users on social media and online. This harm includes, but is not limited to, reputational harm and loss of customer goodwill.

70.     Further, separately and unbeknownst to Allstate, in March 2022, Cruz was indicted by the State of Colorado on sixteen counts of theft, forgery, and identity theft, among other claims. Cruz is set to begin his criminal trial in three weeks, on April 29, 2024. Should Cruz be convicted, Allstate may not be able to remove these false statements from the public domain. As a result, immediate injunctive relief is necessary.

## COUNT I: DEFAMATION

71.     Allstate repeats and incorporates herein by reference each of the allegations set forth above as if fully set forth herein.

72.     The defamatory statements as outlined in Paragraphs 1–57, written and published by Defendants, falsely claimed without privilege that Allstate sells its customers' sensitive personal information to criminals in exchange for gift cards. This concerns existing facts that were capable of objective verification.

73.     The defamatory statements specifically identify Plaintiff Allstate by name and were about and concerning Allstate.

74.     The defamatory statements were published, made available, and republished on multiple online platforms: (1) via two of Defendants' websites; (2) on LinkedIn; (3) on Instagram; (4) on Facebook; (5) YouTube; (6) on CNN; and (7) on MSNBC.

75.     Defendants' statements are defamatory *per se*. By claiming that Allstate was selling its customers' sensitive information for gift cards, Defendants impute a want of integrity and lack of integrity by Allstate in conducting its profession. By claiming that Allstate sold its customers' sensitive information to criminals, Defendants accuse Allstate of committing a crime. By claiming that Allstate enabled schemes of human trafficking, sex trafficking, and rape through selling sensitive customer information, Defendants further accuse Allstate of committing crimes.

76.     Defendants had no reasonable basis for the statements. Defendants also knew that the statements were false or published them with a reckless disregard of whether they were true or false. The actions of Defendants were therefore done with actual malice.

77.     On information and belief, the defamatory statements were published out of spite and vengeance following a separate legal proceeding between Allstate and Defendants.

78.     Allstate has sustained financial, reputational, and other injuries as a result of Defendants' defamation. Such injuries (including legal fees) exceed $75,000.

79.     Allstate further requests injunctive relief due to the irreparable harm it has suffered and will continue to suffer so long as Defendants' false statements remain in the public domain. Allstate requests an Order (1) requiring Defendants to immediately retract and remove the false and defamatory statements from their websites and any and all social media accounts that they have access to, and (b) enjoining Defendants from making further defamatory statements about Allstate on any website or platform.

## COUNT II: COLORADO CONSUMER PROTECTION ACT
### (C.R.S. § 6-1-101, et seq.)

80.     Allstate repeats and incorporates herein by reference each of the allegations set forth above as if fully set forth herein.

81.     Defendants' false and defamatory statements, as described in detail above, constitute deceptive trade practices in violation of Colorado Law, C.R.S. § 6-1-105. Defendants' statements disparage Allstate's goods, services, and business by false and misleading representations of fact.

82.     Defendants knew that their factual assertions about Allstate were deceptive.

83.     Defendants published their defamatory statements in the course of their identity theft protection business. Defendant Cruz willfully posted the statements on his LinkedIn page as the founder, owner, operator, and representative of PIP PERSONAL IDENTITY PROTECTION, LLC.

84.     Defendants published false statements about Allstate for a commercial purpose. Defendants desire to sell products in competition with Allstate. The landing page of each of the defamatory websites contain links to an "application." Those "application" links re-direct to https://personal75.wearelegalshield.com/, a website that sells "protection for your family, your

30

business & your personal identity." Defendants defamed Allstate while simultaneously promoting their own insurance sales on LegalShield in order to garner more business on that platform.

85.     The false and defamatory statements appear on the two PIP PERSONAL IDENTITY PROTECTION, LLC websites, the PIP Facebook page, and the PIP Instagram page so that the company can derive substantial financial benefit. Defendants derived financial benefits through increased sales of services because they defamed Allstate.

86.     Defendants' statements occurred within the three-year statute of limitations period provided by C.R.S. § 6-1-115.

87.     Defendants' statements have harmed Allstate and will further impair the value of Allstate's name, reputation, brand, and goodwill without a permanent injunction.

88.     Allstate is entitled to permanent injunctive relief by way of

a.      Removal of all of Defendants' defamatory statements on Defendants' websites and social media accounts;

b.      Enjoining Defendants, and all those acting in concert with them, from repeating such statements; and

c.      Enjoining Defendants, and all those acting in concert with them, from engaging in further deceptive trade practices relating to Allstate.

89.     Allstate is also entitled to recover from Defendants its cost of litigation, including reasonable attorneys' fees, pursuant to C.R.S. § 6-1-113(2)

## PRAYER FOR RELIEF

**WHEREFORE**, Allstate prays for judgment in its favor and against Defendants for:

a.      Compensatory damages in an amount to be determined at trial;

       b.      Actual, consequential, and special damages, in an amount to be determined at trial;

       c.      Punitive damages;

       d.      Reasonable and necessary attorneys' fees;

       e.      Reasonable and necessary costs of the suit;

       f.      Prejudgment and post-judgment interest at the highest lawful rates;

       g.      Declaratory and injunctive relief; and

       h.      Such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues triable as of right to a jury.

Dated: April 5, 2024              BENESCH, FRIEDLANDER, COPLAN &
                                     ARONOFF LLP

                                     */s/ J. Scott Humphrey*
                                     J. Scott Humphrey
                                     71 South Wacker Drive, Suite 1600
                                     Chicago, Illinois 60606-4637
                                     Telephone: (312) 212-4949
                                     Facsimile: (312) 767-9192
                                     Email: shumphrey@beneschlaw.com

                                     *Counsel for Plaintiff Allstate Insurance Company*

EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action Number: 20-cv-03139-DDD-MEH

ALLSTATE INSURANCE COMPANY,

      Plaintiff,

v.

JOHN CRUZ,

      Defendant.

---

## STIPULATED PROTECTIVE ORDER

---

Upon a showing of good cause in support of the entry of a protective order to protect the discovery and dissemination of Confidential Information, IT IS HEREBY ORDERED:

1.    This Protective Order shall apply to all documents, materials, and information appropriately designated as Confidential as outlined herein. This includes, without limitation, documents produced, answers to interrogatories, responses to requests for admission, deposition testimony, and other information or documents disclosed pursuant to the disclosure or discovery duties created by the Federal Rules of Civil Procedure.

2.    "Confidential Information" means any document, electronically stored information, testimony, or response to a discovery request, including any extract, abstract, chart, summary, note, or copy made therefrom - not made available to the public - and designated by one of the Parties in the manner provided below as containing: customer information, information that implicates common law and/or statutory privacy interests;

competitive business information or information that a party believes is otherwise entitled to protection.

     3.     Any designation of Confidential Information must have been reviewed by an attorney who made a good faith determination that the information is entitled to protection.

     4.     When Confidential Information is produced or otherwise disclosed by a Party, it will be designated in the following manner:

     a.  By placing or affixing on the document (in a manner that will not interfere with their legibility) the following or other appropriate notice: "Confidential."

     b.  By imprinting the word "Confidential" next to or above any response to a discovery request; and

     c.  With respect to transcribed testimony, whenever possible, by indicating on the record what portions of the transcript should be designated "Confidential." Alternatively, after transcription, a Party may designate portions of the transcript as Confidential provided that written notice of the designation is promptly given to all counsel of record within thirty (30) days after notice by the court reporter of the completion of the transcript.

     d.  Groups of documents, such as medical records, or insurance company claim log documents can be designated through a group designation with a cover page marked confidential and with bate stamp numbers for the designated group of documents.

     5.     Confidential Information shall be subject to the following restrictions:

      a.     It shall be used only for the purpose of this litigation and not for any other purpose whatsoever; and

      b.     It shall not be communicated or disclosed by any Party's counsel or a Party in any manner, either directly or indirectly, to anyone except for purposes of this case and pursuant to the restrictions stated herein.

6.     Confidential Information shall not, without the consent of the designating Party or further Order of the Court, be disclosed except that such information may be disclosed to:

      a.     attorneys actively working on this case.

      b.     persons regularly employed or associated with the attorneys actively working on the case whose assistance is required by said attorneys in the preparation for trial, at trial, or at other proceedings in this case.

      c.     the Parties, including designated representatives for plaintiff and defendants; expert witnesses, individuals evaluating the case for liability or settlement purposes, and consultants retained in connection with this proceeding, to the extent such disclosure is necessary for preparation, trial or other proceedings in this case.

      d.     the Court and/or its employees ("Court Personnel").

      e.     stenographic reporters who are engaged in proceedings necessarily incident to the conduct of this action.

      f.     deponents, witnesses, or potential witnesses provided all such individuals have received a copy of this Protective Order; and

      g.     other persons by written agreement of all the Parties.

7.      Prior to disclosing any Confidential Information to any person listed above (other than the Parties, counsel, persons employed by counsel, court personnel, and stenographic reporters), counsel shall provide such person with a copy of this Protective Order and receive a signed agreement that the recipient will abide by the terms of the Protective Order.

8.      A Party may object to the designation of information as Confidential information by giving written notice to the Party designating the disputed information. The written notice shall identify the information to which the objection is made. If the Parties cannot resolve the objection within ten (10) business days after the time the notice is received, it shall be the obligation of the Party designating the information as Confidential to follow the steps set forth in Magistrate Judge Michael E. Hegarty's Practice Standards applicable to Motions Practice in requesting that the Court determine whether the disputed information should be subject to the terms of this Protective Order. If a motion is timely filed, the disputed information shall be treated as Confidential under the terms of this Protective Order until the Court rules on the motion. If the designating party fails to file such a motion within the prescribed time, the disputed information shall lose its designation as Confidential and shall not thereafter be treated as Confidential in accordance with this Protective Order. In connection with a motion filed under this provision, the party designating the information as Confidential shall bear the burden of establishing that good cause exists for the disputed information to be treated as Confidential.

9.      At the conclusion of this case, including completion of all possible appellate procedures, each document and all copies thereof which have been designated as Confidential shall be returned to the Party that designated it Confidential, or the Parties

4

may elect to destroy Confidential documents at the conclusion of the time required by the rules governing attorneys for maintenance of such document, except that one copy of the document maybe retained either physically or electronically in compliance with the retention policy of the law firm. Where the Parties agree to destroy Confidential documents, the destroying Party shall provide all Parties with an affidavit confirming the destruction.

10.    In the event Confidential Information is used in any court filing or proceeding in this action, it shall not lose its Confidential status as between the parties through such use. Confidential Information and pleadings or briefs quoting or discussing Confidential Information will not be accepted for filing "under restricted access" or otherwise kept out of the public record in this action, except by court order issued upon motion of the party seeking to file the documents under restricted access. Any motion requesting leave to file documents under restricted access shall comply with the requirements of the applicable Federal rule, D.C.COLO.LCivR 7.2.

11.    Nothing in this Protective Order shall be construed to prevent a party from using Confidential Information during depositions, during a Court hearing, or at the trial of this matter.  Procedures for the protection of Confidential matters at trial, if any, shall be arrived at separately by the parties or otherwise determined by the Court in advance of trial.

12.    Notwithstanding any other provision of this Order to the contrary, no party is precluded from sharing any Confidential Information or document(s) with any lawfully constituted government or enforcement authority, pursuant to a lawful

subpoena provided, however, that reasonable notice shall be given to the other party prior to any such disclosure.

13.     The inadvertent or unintentional disclosure by the supplying party of Confidential Information, regardless of whether the material was so designated at the time of disclosure, shall not be deemed a waiver, in whole or in part, of a party's claim of confidentiality, either as to the specific material disclosed or as to any other material relating thereto or on the same or related subject matter.

14.     This Protective Order may be modified by the Court at any time for good cause shown following notice to all Parties and an opportunity for them to be heard.

ORDERED this 24th day of February, 2021.

BY THE COURT:

Michael E. Hegarty

Michael E. Hegarty
United States Magistrate Judge

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03139-NYW-MEH

ALLSTATE INSURANCE COMPANY,

     Plaintiff,

v.

JOHN CRUZ,

     Defendant.

---

## RECOMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge**.

The parties have filed their respective Motions for Summary Judgment. ECF 191 (Plaintiff); 196 (Defendant).

Defendant was an agent selling Plaintiff's insurance products. The parties had an Exclusive Agency Agreement ("Contract"). Plaintiff alleges breach of that Contract among other causes of action. In addition to two counterclaims for breach of contract (non-payment of commissions at Count I; seeking payment for ending the agency agreement at Count III), Defendant brings counterclaims for unjust enrichment (Count II), breach of the implied covenant of good faith and fair dealing (Count IV), defamation (Count V), and discrimination in violation of 42 U.S.C. § 198 (Count VI). ECF 40 at 16-20. Plaintiff seeks partial summary judgment in its favor on its first claim for breach of contract, and summary judgment in its favor on all of Defendant's six

counterclaims. Defendant seeks summary judgment in his favor on Plaintiff's breach of contract claim and all his counterclaims.[1]

For the following reasons, I respectfully recommend granting Plaintiff's Motion and denying Defendant's Motion.

## **FINDINGS OF FACT**

Cross motions for summary judgment are examined under the usual Rule 56 standards, with a court viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. *Denver Inv. Advisors, LLC v. St. Paul Mercury Ins. Co.*, No. 17-CV-00362-MEH, 2017 WL 3130923, at *1 (D. Colo. July 24, 2017). The following facts are undisputed[2] unless otherwise cited.

1.      Allstate provides insurance including property and casualty insurance, and other financial products and services to individuals and businesses in the State of Colorado. ECF 191 at 1.

2.      In addition to providing these products and services directly to customers, Allstate appoints exclusive agents ("EAs"), through its Exclusive Agency Program, to sell Allstate products. *Id.*

3.      EAs are not employees of Allstate but are independent contractors. ECF 191 at 2.

---

[1] Although Defendant states he is seeking summary judgment on all of Plaintiff's claims, he does not address Plaintiff's Count II for violation of the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.*, and its Count III is for misappropriation of trade secrets in violation of the Colorado Trade Secrets Act, Colorado Revised Statute §§ 7-74-101 *et seq.* ECF 1.

[2] *See infra,* regarding the standard applicable to Defendant's responses to Plaintiff's undisputed facts.  I have considered his responses and find the summary in Plaintiff's reply brief (ECF 210 at 2) to be an accurate accounting of the deficiencies of Defendant's responses under Fed. R. Civ. P. 56(c), the Court's Civil Practice Orders and Standards, and applicable case law.

4.     EAs exclusively sell Allstate products; they cannot sell insurance products from carriers other than Allstate, except in limited circumstances and only if those products from other carriers are pre-approved by Allstate through Allstate's Ivantage program.  *Id.*

5.     Before they receive their appointments from Plaintiff, all EAs are required to first enter into an exclusive agency agreement with Plaintiff that sets forth the terms and conditions of the EA's relationship with Plaintiff. *Id.*

6.     In April of 2010, Defendant purchased a book of business from Bill Kyle and signed the Contract with Plaintiff. *See* ECF 191-1 at 2; 191-2 at 7.

7.     William Kyle was an Allstate EA, who sold his economic interest in the Allstate books of business he serviced to Cruz. ECF 205-10.  Prior to terminating his EA Agreement, Kyle did not work for any independent agency, did not sell or services any policies for any other carriers, and did not have any customers in the Allstate books of business that had policies with insurance carriers other than Allstate. *Id.*

8.     Defendant operated his Exclusive Agency at 7510 US Highway 287 in Broomfield Colorado from approximately April 2011 through the date his EA Agreement terminated on August 26, 2020. ECF 191 at 7.

9.     While operating as an EA, Defendant also engaged in outside business activities as an author. Specifically, Defendant published two books entitled, "Whistleblower Bloodmoney" and "World Banking World Fraud, Using Your Identity," both of which related to his work for HSBS Bank and certain alleged criminal activity Defendant claims to have uncovered.  ECF 191 at 7.

10.     In 2012, Defendant's wife opened an independent insurance agency, later known as Colorado Premier Insurance ("CPI"), which sold property and casualty products on behalf of other carriers in competition with Allstate.  *Id.*

11.     Pursuant to the terms of the Contract, Defendant could sell Plaintiff's insurance products as an Exclusive Agent and had access to confidential information, including:

> Business plans of the Company; information regarding the names, addresses, and ages of policyholders of the Company; types of policies; amounts of insurance; premium amounts, the description and location of insured property; the expiration and renewal dates of policies; policyholder lists and any policyholder information subject to any privacy laws; claim information and certain information and materials identified by the Company as confidential or information considered a trade secret as provided herein.

ECF 191-1 at 5.

12.     The Contract specified that "[a]ll telephone numbers used in connection with business conducted pursuant to this [Contract] are property of the [Plaintiff]." *Id.* at 6.

13.     In limited circumstances, the Contract allowed Defendant to sell pre-approved insurance products from other carriers. *Id.* at 2. It states that Defendant could not "either directly or indirectly, solicit, sell, or service insurance of any kind for any other company agent, or broker, or refer a prosect to another company, agent, or broker, without prior written approval of the [Plaintiff]." *Id.*

14.     Allstate EAs may refer customers to independent agencies to the extent the business cannot be written through Allstate. If an Allstate EA provides customer information, such as contact information, with the referral, such information is provided only with the customer's consent. ECF 205-3 through 6.

15.     As part of the Contract, Defendant also agreed to abide by the Supplement for the R3001
Agreement ("Supplement"), the IC Manual, and the Allstate Agency Standards, all of which are
expressly incorporated into the Contract.  *Id*. at 3.

16.     The Contract may not be modified except by written agreement between Allstate and the
EA which expressly states that it modifies the Contract and "no other written statements,
representations, or agreements and no oral statements representations or agreement will be
effective to modify Contract." *Id*. at 3-4.

17.     In October 2019, Plaintiff received an email from another Allstate agent reporting "we
have a new customer who was working with an Allstate agent who brokers her business. We just
wrote the home and auto and she said she need[s]to call her Allstate agent to cancel her Safeco
policy. The agent is John Cruz and we have a recorded call that states he brokers her other lines of
business. What do we need to do to report an agent who is also running an independent agency??"
ECF 191-11 at 2.

18.     Allstate leaders immediately forwarded the information to Allstate's Human Resources
Producer Agency Relations Team ("HR Part" or "Investigative Services"), an independent
department at Allstate responsible for conducting investigations related to the allegations against
EAs, for review. ECF 191 at 8.

19.     Plaintiff investigated the complaint and found that "[t]he weight of evidence is sufficient
to support the conclusion that R3001S Exclusive Agent John Cruz is brokering for other carriers
and he could not provide a credible explanation on his involvement with these carriers." ECF 192-
3 at 5.

20.     For example, Defendant had several emails in his Allstate account related to customers' Travelers and Safeco policies and emails that suggested he was working on behalf of CPI. ECF 191 at 9.

21.     Defendant had an email he received from an Allstate customer asking about the renewal date on his Progressive policy, and another email from another Allstate customer in which she is forwarding an email she received from jon@copremierins.com attaching "Your Safeco Insurance Documents" to Defendant at his Allstate email address and asking Defendant questions about how her paying off a loan will affect her Safeco policy. *Id.*

22.     The Contract also allowed Defendant to refer potential clients to independent agencies "as long as [he] ha[d] no involvement with the referral business other than to give out names, addresses and phone numbers." ECF 191-1 at 2; 192-1 at 9. The Contract noted that "the referral of business to an independent agency in which you have either a direct financial interest or an indirect financial interest (e.g., spouse has ownership interest) is not considered gratuitous and is not authorized." ECF 191-1 at 2; 191-5 at 9.

23.     Defendant routinely referred business to CPI, the insurance agency owned by his wife. ECF 191-2 at 16.

24.     The Contract may be terminated in three ways: (1) at any time by mutual agreement of the parties in writing; (2) by either party with ninety days' written notice if termination is without cause; and (3) by Allstate immediately if the termination was for cause, including cases of breach of the Contract, fraud, forgery, or misrepresentation of conviction of a crime. ECF 191-1 at 9.

25.     Following its internal investigation, Plaintiff accepted Investigative Services' August 3, 2020 recommendation for termination and terminated its Contract with Defendant on August 26,

2020, indicating the reason for termination as "for cause" on the basis of "unauthorized" brokering in breach of the Contract. ECF 191-15 at 2; 191-16 at 2; 191-17 at 1.

26.     If the Contract terminates, it provides that Defendant would be entitled to compensation for any new and renewal business processed up to an including the date of termination of the Contract, and business processed up to the termination date. ECF 192-1 at 8.

27.     Defendant received a payment of $14,321.71 on September 18, 2020, which was his final commission payment for the new and renewal business processed up to the date of termination. ECF 191-20 at 2.

28.     Although Plaintiff terminated Defendant for cause, it gave him ninety days to sell his or her economic interest in the book of business to a purchaser that must be approved by Plaintiff. ECF 192-1 at 29. Plaintiff's Termination Letter to Defendant indicated that the sale of Defendant's economic interest in the book of business must be completed on or before December 1, 2020. ECF 191-17 at 2.

29.     Under the terms of the Contract, if Defendant does not sell his book of business, he may elect to receive a Termination Payment from Plaintiff. ECF 192-1 at 40.

30.     The Contract also requires that upon termination, Defendant must (1) return of all property belonging to Plaintiff, (2) cease representing himself as an agent or representative of Plaintiff, and (3) cease using any phone numbers used for operation of his Exclusive Agency and execute an order of transfer of responsibility for any such numbers to Plaintiff or any party Plaintiff designates. ECF 191-1 at 9.

31.     When Allstate terminates an EA Agreement immediately for cause, it is Allstate's standard practice to immediately revoke the EA's and his or her employees' access to Allstate systems. ECF 191 at 6.

32.     On August 26, 2020, Territorial Sales Leader ("TSL") Richard Poduska and Field Sales Leader ("FSL") Brian Mitchum went to Defendant's Allstate Exclusive Agency location and delivered the termination letter to him. Defendant refused a request from Poduska and Mitchum to transfer the phone number for his Exclusive Agency. ECF 191-16 at 2.

33.     In the days following the Contract's termination, on August 27, 2020, December 2020, February 2021, and July 30, 2021, the number Defendant used to operate his Allstate Exclusive Agency was called by Poduska's colleague, Allstate EA Catherine Davis, and the Chief Executive Officer of Telepathy Networks Penny Silvis, respectively. ECF 191-24 at 1; 191-23 at 2; 191-25 at 2.    Poduska noted that the line was not forwarded to the "CCC" and Davis reported that "[a] woman answered the phone and confirmed the number I had called was Cruz's agency. She also confirmed that the agency could help with servicing Allstate policies." ECF 191-24 at 1; 191-23 at 2. Silvis reported that "[t]he woman who answered identified herself as "Trisha" and said that I had reached Colorado Premier Insurance." ECF 191-25 at 2.

34.     The Termination Payment is contingent upon Defendant not soliciting the purchase of products or services in competition with those sold by Plaintiff from any location within one mile of the agency sales location at the time the Contract is terminated. ECF 191-1 at 9; 192-1 at 9; 192-2 at 4.

35.     On September 30, 2020, a month after his termination, Defendant sent an email from johncruz@copremierins.com to several Allstate customers. ECF 191-27 at 2. Defendant wrote:

"[y]ou may have noticed that Allstate has been making lots of changes recently. If you Google 'Allstate cuts' you will see articles related to drastic cuts in management and agents." *Id.* He continued, "I have been informed that Allstate is in the process of terminating my office . . . " and that "I am in the process of transitioning to working as an insurance agent with my family's insurance brokerage called Colorado Premier Insurance; to continue being an insurance agent with a broader range of services and multiple insurance companies." *Id.*

36.     Cruz used an Allstate customer list to compile the list of customer emails to send the September 30, 2020 solicitation email. ECF 205-11.

37.     Plaintiff's Termination Letter to Defendant indicated that his Termination Payment is "conditioned upon, for example, compliance with the confidentiality and non-solicitation provisions that survive termination of the [Contract] and the immediate return of all [Plaintiff's] property." ECF 191-17 at 2.

38.     Following termination of Defendant's EA Agreement, as required by applicable regulations, Plaintiff submitted notices to the Financial Industry Regulatory Authority ("FINRA") and the Colorado Division of Insurance on Cruz's termination.  ECF 191-21 and -22.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome

of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil

10

Procedure specifically require a certain type of admissibility, *i.e.,* the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005).

Defendant is proceeding *pro se* in this case. "A *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972)). "The *Haines* rule applies to all proceedings involving a *pro se* litigant, including . . . summary judgment proceedings." *Id.* at n.3 (citations omitted). However, the court cannot be a *pro se* litigant's advocate. *Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008). In addition, *pro se* litigants must follow the same procedural rules that govern other litigants. *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir.1994). This includes the court's local rules. *Green v. Dorrell*, 969 F.2d 915, 917 (10th Cir. 1992).

On summary judgment, the court has no duty to search the record on behalf of a litigant to find evidence supporting the litigant's summary judgment interests. *See Cross v. Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (explaining that, on a motion for summary judgment, "'it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without . . . depending on the trial court to conduct its own search of the record'" and the district court has no obligation "to comb the record in order to make [the plaintiff's] arguments for him' " (first quoting *Downes v. Beach*, 587 F.2d 469, 472 (10th Cir. 1978); then quoting *Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000)).

This same standard applies in *pro se* cases. *See Handy v. City of Sheridan*, 636 Fed. Appx. 728, 2016 WL 66170, at *13 n.15 (10th Cir. Jan. 6, 2016) (affirming summary judgment against a *pro se* plaintiff, stating that the district court had no duty to review the record independently for

evidence that might negate summary judgment, and concluding the district court did not err by failing to consider evidence that the *pro se* plaintiff attached to his Complaint but did not cite in his opposition to summary judgment (citing *Cross*, 392 F.3d at 1290)); *McKinzy v. I.R.S.,* 367 Fed. Appx. 896, 897 (10th Cir. 2010) (affirming summary judgment against a *pro se* plaintiff who alleged generally that disputed issues of material fact precluded summary judgment but failed to identify any part of the record to support his claim because "'[j]udges are not like pigs, hunting for truffles buried in briefs.'" (quoting *Gross v. Burggraf Constr. Co*., 53 F.3d 1531, 1546 (10th Cir. 1995)).

The Court may deem as admitted a party's statements of fact if not properly controverted. The Tenth Circuit approves such treatment of uncontroverted factual assertions on summary judgment. *See Taylor v. Pepsi–Cola Co*., 196 F.3d 1106, 1108 n.1 (10th Cir. 1999) (noting that the district court deemed defendant's submitted facts as admitted because plaintiff did not controvert them as the local rules required); *see also Coleman v. Blue Cross Blue Shield of Kan., Inc*., 287 Fed. Appx. 631, 635 (10th Cir. 2008) (affirming summary judgment and agreeing "with the district court that it is not the court's responsibility to conduct a fishing expedition of plaintiff's affidavit or any other record evidence in order to support the assertions made in her [summary judgment] response," and holding that the district court "was correct to admit all facts asserted in [defendant's] summary judgment motion that are not controverted by a readily identifiable portion of the record" (citation and internal quotation marks omitted)).

## ANALYSIS

Under Colorado law, to establish a claim for breach of contract, a plaintiff must prove the following elements: (1) the existence of a contract, (2) performance by the plaintiff or some

justification for nonperformance, (3) failure to perform the contract by the defendant, and (4) resulting damages. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). Additionally, "the terms of a contract must be expressed with a reasonable certainty." *Am. Min. Co. v. Himrod-Kimball Mines Co.*, 235 P.2d 804, 807 (Colo. 1951).

Here, the parties do not dispute the existence of the Contract. ECF 191; 209. Defendant admits that he signed it on April 1, 2010, ECF 191-2 at 23, but disputes that he failed to perform the Contract. Defendant also argues in his Motion that Plaintiff breached the Contract by failing to issue his Termination Payment. ECF 196 at 5. Plaintiff does not dispute that it did not make a Termination Payment but argues that Defendant's breach of the Contract excused its non-payment. ECF 191 at 24. In turn, Defendant argues that the provision that would excuse Plaintiff's non-payment of the Termination Payment is unenforceable under Colorado law. ECF 209 at 5.

## I.      Plaintiff's Breach of Contract Claim

Plaintiff argues three instances of an undisputed breach by Defendant: (1) soliciting Plaintiff's customers; (2) operating a competing business,[3] and (3) failing to return Plaintiff's phone number. ECF 191 at 17-22. Regarding the third instance of breach, Plaintiff points the Court to the provision of the Contract stating that upon termination of the Contract, Defendant must "*immediately* return all property belonging to the [Plaintiff]" and "*immediately* cease to use such telephone numbers referenced in Section IX." ECF 191-1 at 9 (emphasis added). Section IX of the Contract specifies that "[a]ll telephone numbers used in connection with business conducted

---

[3] Plaintiff's motion for preliminary injunction (to enjoin Defendant from soliciting Plaintiff's customers and using its confidential information and telephone number to retain or obtain new customers for his competing insurance business) was denied.  ECF 59.

pursuant to this [Contract] are the property of the [Plaintiff]." *Id.* at 6. In Colorado, courts must look to the plain and ordinary meaning of contract provisions. *Chacon v. Am. Fam. Mut. Ins. Co.*, 788 P.2d 748 (Colo. 1990). Thus, I find that the Contract required Defendant to return to Plaintiff the phone number that he used as an EA for Plaintiff upon termination of the Contract.

Here, Plaintiff provides evidence that Defendant never returned its phone number in the form of three separate declarations. ECF 191-24 at 1; 191-23 at 2; 191-25 at 2. In response, Defendant contends, and provides his own affidavit for the same, that he attempted to transfer the phone number, but it had been placed on a fraudulent hold by the phone carriers. ECF 209-16 at 2. Defendant never argues that the phone number at issue was returned to Plaintiff, and he does not dispute that it is the property of Plaintiff. *See* ECF 209. It is undisputed that Defendant did not return the phone number to Plaintiff once the Contract terminated and that he continued to use that number for his competing business for nearly a year following the termination of his Contract.

Under Colorado law, "[a] party has substantially performed when the other party has substantially received the expected benefit of the contract." *Stan Clauson Assocs., Inc. v. Coleman Bros. Const., LLC*, 297 P.3d 1042, 1045 (Colo. App. 2013). Here, regardless of whether Defendant attempted to transfer Plaintiff's phone number, Plaintiff did not receive the benefit of using and controlling its phone number according to Defendant's own affidavit. *See* ECF 209-16 at 2. According to Defendant's own exhibit, he told Plaintiff "I'm not forwarding my phones. Not until I get paid." ECF 196-8 at 4. Defendant provides no case law to support the assertion that his attempts to transfer the number either constitutes substantial performance or does not constitute a material breach. Thus, Defendant's failure to substantially perform its duties under the Contract

14

constitutes a breach. *See Stan Clauson Assocs., Inc. v. Coleman Bros. Const., LLC*, 297 P.3d 1042, 1045 (Colo. App. 2013).

 I find no genuine issue of material fact as to Defendant's breach of the Contract arising from Defendant's failure to return the phone number and recommend granting summary judgment for Plaintiff's breach of contract claim in that regard.

 Plaintiff further argues that the Defendant violated the non-compete provision of the Contract, and sets forth evidence that first, Defendant was selling insurance at the location of the agency within the year of the Contract's termination, and second, Defendant was soliciting Plaintiff's customer's that he serviced as an Allstate EA to purchase competing insurance policies and services from his wife's insurance company after termination of the Contract and during the one year non-solicitation period.

 Defendant argues that the non-compete provision is void as a matter of law. Plaintiff argues that the non-compete provision is valid and enforceable under Colorado law because it is narrowly tailored to prevent misappropriation of trade secrets, and limits Defendant from competing for only one year and only in a one mile radius of his prior agency location. Contract at XVII, D, ECF 191-1 at 9-10.

 Colo. Rev. Stat § 8-2-113 provides "[a]ny covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for an employer shall be void" unless that covenant fits into one of four defined exceptions. Colorado law treats non-solicitation clauses as covenants not to compete. *See, e.g., Saturn Systems, Inc. v. Militare* , 252 P.3d 516 (Colo. App. 2011). The protection of trade secrets is an exception to the prohibition against restrictive covenants. Colo. Rev. Stat. § 8-2-113 (2)(b). The interpretation of

the language in a contract is a matter of law, as is the question of whether the contractual provision

is enforceable. *Ball Dynamics International, LLC v. Saunders*, 2016 WL 10859782, * 4 (D. Colo.

Nov. 14, 2016). To determine the applicability of the trade secret exception in this case, the Court

considers (1) whether the non-compete provision is justified, and (2) the reasonableness of the

non-compete provision's effect. *Mgmt. Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 766

(Colo. App. 1988).

      The restrictive covenant provision here is narrowly tailored in time and geographic scope.

Admittedly, the covenant does not mention confidential information or trade secrets, nor is the

restriction contained within any clause aimed at protecting trade secrets. *See* Contract at IV, and

XVIII. ECF 191-1 at 4-5, 9-10; *Colorado Accounting Machines, inc. v. Mergenthaler*, 44

Colo.App. 155, 609 P.2d 1125, 1126 (1980). Yet reading the Contract, specifically, reading the

"Obligations Upon Termination of Agreement" section in conjunction with the "Company

Property, Confidentiality" section, supports the conclusion that one purpose of the noncompetition

provision was to protect trade secrets and confidential information. *Great Am. Opportunities, Inc.

v. Kent*, 352 F. Supp. 3d 1126, 1136 (D. Colo. 2018) (citing *USF & G v. Budget Rent-A-Car*, 842

P.2d 208, 213 (Colo. 1992) ("The meaning of a contract is found by examination of the entire

instrument and not by viewing clauses or phrases in isolation.").

      In determining whether a noncompetition covenant fits within the "trade secrets exception"

of § 8.2.113(2), Colorado courts apply a two-prong test: "[t]he trial court must first examine the

factual situation to determine whether a restrictive covenant is justified at all," in other words, if

there is a trade secret. *Mgmt. Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 766 (Colo. App.

1988). "The trial court must then examine the specific terms of the noncompetition clause to determine the reasonableness of their effect." *Id.*

Under the Colorado Uniform Trade Secrets Act, a trade secret is defined as:

> [T]he whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value. To be a 'trade secret' the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

Colo. Rev. Stat. § 7–74–102(4). The factors to consider in recognizing a trade secret include (1) the extent to which the information is known outside the business, (2) the extent to which it is known to those inside the business, *i.e.,* by the employees, (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended in obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information. *Porter Industries, Inc., v. Higgins,* 680 P.2d 1339 (Colo. App.1984). What constitutes a trade secret is a question of fact for the trial court. *Network Telecommunications, Inc. v. Boor–Crepeau*, 790 P.2d 901 (Colo. App.1990).

Plaintiff contends, and Defendant admits, that post-termination, Defendant took a full customer list containing contact information for the Allstate customers he serviced as an EA.  This list is a unique compilation of information that could only be obtained through Plaintiff's systems. When asked how he complied a list of people to send his post-termination email to, Defendant testified, "[f]rom the book of business I bought from Bill Kyle." ECF 205-11 at 4. This supports a finding that the listing of names and contact information was "of value" under the statute.

Moreover, the uncontroverted record evidence shows that Plaintiff takes steps to protect this information, including educating its EAs about protecting confidential information, keeping its databases password protected and only accessible on a need to know basis, having its EAs and the EAs' employees sign agreements which have confidentiality obligations, and putting in place safeguards to alert Allstate if confidential information is being improperly sent outside the systems. ECF 205-7 at 5, 11; 205-8 at 8. Any sharing of customer information, including contact information, with a referral to an outside agency, is only done with the customer's consent. ECF 205-3, 205-4 and 205-5.

Defendant contends that he did not purchase trade secrets, and that Plaintiff permits the "selling" of such information in exchange for gift cards. He further contends he purchased a business from a third party (Bill Kyle), who he claims was not affiliated with Allstate. The evidence does not support this. After a careful review of the record, there is no genuine issue of material fact that occasionally an Allstate EA may receive a gift card from independent agencies as a thank you for the referral. Kyle was an EA and did not work for any other agency.

In addition, Defendant was provided with ninety days to sell his economic interest in the Allstate book of business, which was not required by the Contract because Defendant was terminated for cause. There is no genuine issue of material fact that as a result of his post-termination conduct which violated the Contract, Plaintiff did not pay Defendant a termination payment.

Accordingly, I recommend that the motion for partial summary judgment be granted to the extent Plaintiff relies upon the violation of the post-termination restrictive covenant and non-solicitation provision.

II.  **Defendant's Counterclaims for Breach of Contract**

A.  Termination for Cause

In his briefing in support of his motion for summary judgment, Defendant maintains that

he never breached the Contract. ECF 196 at 3. As explained supra, I recommend otherwise.  In

addition, out of an abundance of caution, I note that Defendant does not respond to a number of

Plaintiff's stated facts. ECF 191 at 6, 9, 17; 209. Therefore, he concedes that the Contract may be

terminated by Plaintiff for cause, and that Plaintiff terminated the Contract for "unauthorized"

brokering. ECF 191-1 at 6, 9, 17; 209; *see also Rose v. City of Lafayette, Colo.*, No. 05-cv-00311-

WDW-MJW, 2007 WL 485228, at *1 (D. Colo. Feb. 12, 2007) (when plaintiff does not provide a

response to defendant's' statements of undisputed facts nor include statement of undisputed or

disputed facts, court will accept the facts as set forth in the defendant's briefs as undisputed). As

the Supreme Court has held:

> As we have emphasized, "[w]hen the moving party has carried its burden under
> Rule 56(c), its opponent must do more than simply show that there is some
> metaphysical doubt as to the material facts . . . . Where the record taken as a whole
> could not lead a rational trier of fact to find for the nonmoving party, there is no
> 'genuine issue for trial.' " *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*,
> 475 U.S. 574, 586–587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted).
> "[T]he mere existence of some alleged factual dispute between the parties will not
> defeat an otherwise properly supported motion for summary judgment; the
> requirement is that there be no genuine issue of material fact." *Anderson v. Liberty
> Lobby, Inc*., 477 U.S. 242, 247–248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). When
> opposing parties tell two different stories, one of which is blatantly contradicted by
> the record, so that no reasonable jury could believe it, a court should not adopt that
> version of the facts for purposes of ruling on a motion for summary judgment.

*Scott v. Harris*, 550 U.S. 372, 380 (2007). In short, "a plaintiff may not, in defending against a

motion for summary judgment, rest on mere allegations . . . ." *Anderson v. Liberty Lobby*, 477 U.S.

at 259; *see also Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998).

B.   The Implied Covenant of Good Faith and Fair Dealing

As an affirmative defense and counterclaim, Defendant alleges that Plaintiff breached the implied covenant of good faith and fair dealing by wrongfully terminating the Contract. ECF 40 at 18. Plaintiff argues that the Colorado Court of Appeals has declined to recognize such a claim. ECF 210 at 13. It cites *Pittman v. Larson Distrib. Co.*, 724 P.2d 1379 (Colo. App. 1986), which found "substantial authority" against implied covenants of good faith and fair dealing in employment contracts. However, it is undisputed that the Contract at issue was an independent contractor agreement, not an employment contract. ECF 191-2 at 10, 24; 209 at 7. Colorado has recognized the implied duty of good faith and fair dealing for independent contractor agreements, like the Contract in this case. *See O'Reilly v. Physicians Mut. Ins. Co.*, 992 P.2d 644, 646 (Colo. App. 1999). *See also Lutfi v. Brighton Cmty. Hosp. Ass'n,* 40 P.3d 51, 59 (Colo. App. 2001) (same).

The terms of the Contract are clear, and thus, I recommend granting summary judgment in favor of Plaintiff as to this claim.  "[T]he implied covenant of good faith and fair dealing may not be used to invalidate contractual terms that the parties negotiated and agreed on, including a right to terminate the contract." *Rocky Mountain Chocolate Factory, Inc. v. SDMS, Inc*., No. 06-cv-01212-WYD-BNB, 2007 WL 4268962, at * 6 (D. Colo. Nov. 30, 2007) (collecting cases); *see also Amoco*, 908 P.2d 493, 498 (Colo.1995) (The duty of good faith and fair dealing "will not contradict terms or conditions for which a party has bargained."). Here, the Contract contained an express manner in which it could be terminated. So long as Plaintiff complied with the contractual provisions for termination, *i.e.* written notice when terminating for cause, Defendant cannot invalidate the express termination provision of the agreement by bringing this claim. *Ohio Ambulance Sols. LLC v. Am. Med. Response Ambulance Serv., Inc.*, No. 22-CV-00661-STV, 2023

WL 2214526, at *5 (D. Colo. Feb. 24, 2023). I agree with Plaintiff that "Cruz does not provide any evidence . . . to combat the evidence put forth by Allstate as to its investigation and legitimate reason for terminating Cruz." Reply ECF 21 at 12. Defendant's only opposition consists of conclusory statements not supported by citation to any evidence.

Defendant further alleges a breach of the implied covenant of good faith and fair dealing arising from Plaintiff's reporting of his termination for cause to FINRA and the Colorado Division of Insurance. ECF 191-21, 191-22. Plaintiff was statutorily required to send notice within thirty days to the Insurance Commissioner of Colorado upon Defendant's termination for cause. C.R.S.A. § 10-2-416. The same requirement is mandated by FINRA Rule 4530. Defendant has not responded with citation to any authority, nor could the Court find any, that would permit a claim for the implied covenant of good faith and fair dealing in this context.

Thus, I recommend granting summary judgment for Plaintiff as to Defendant's counterclaim for a breach of the implied covenant of good faith and fair dealing.[4]

C.   Failure to Pay Termination Payment and Commission

Defendant also argues that Plaintiff breached the Contract by failing to make a payment for "Ending Agency." ECF 196 at 5. Plaintiff responds that it was not required to make a Termination Payment under the Contract because Defendant did not comply with the Contract's post-termination provisions. ECF 191 at 24. Plaintiff relies upon the express terms of a supplemental document incorporated into the Contract, which states "[Termination] Payments are

---

[4] Defendant continually asserts that his Contract with Plaintiff was terminated because he is a whistleblower. ECF 209 at 7. But again, he provides no evidence to support this allegation. Further, he has not brought a claim for retaliation under Title VII, which would not lie in any event given his independent contractor status.

subject to compliance with the terms of the confidentiality and non-competition provisions of the [Contract]." ECF 192-2 at 4. Defendant may not, "[f]or a period of one year following termination," solicit the purchase of products or services in competition with those sold by Plaintiff "[f]rom any office or business site located within one mile of the agency sales location . . . at the time this [Contract] is terminated." ECF 191-1 at 9; 191-5 at 29, 34, 40.

Plaintiff provides evidence that Defendant breached the non-compete by operating his insurance business from the same location as his Allstate Exclusive Agency. *See* ECF 191-24. Defendant's only response to this allegation is that he was working from home, and he cites to no evidence. ECF 209 at 4. Further, he did not respond directly to statements by Warren Stott, the owner of a neighboring business submitted by Plaintiff. *See id.* Mr. Stott reported that (1) "[t]here is daily foot traffic at [Defendant's] agency location," (2) "[Defendant] maintains a full-time presence at his agency location," and (3) "[Defendant] himself has informed me that, since his affiliation with Allstate ended, he has sold several insurance policies out of the agency location." ECF 191-26 at 3. Therefore, I find Plaintiff exercised its right under the Contract to withhold Defendant's Termination Payment. I recommend granting summary judgment in Plaintiff's favor regarding Defendant's counterclaim for failure to make a payment for "Ending Agency" in breach of the Contact. *See* ECF 196 at 5.

Defendant also argues in his Motion that Plaintiff failed to make a final commission payment to him. ECF 196 at 3. However, his own deposition testimony negates this argument. *See* ECF 191-2 at 58. When asked if he received a final commission payment, Defendant admitted "[t]hat was the month of August, yes." *Id.* Therefore, I find no genuine issue of material fact as to Defendant's breach of contract counterclaims for failure to make commission payments and

recommend granting summary judgment in favor of Plaintiff. *See Ziegler v. Allstate Ins. Co.*, No. 16 CV 869, 2018 WL 1184738 (N.D. Ill. Mar. 7, 2018), *aff'd*, 848 F. App'x 671 (7th Cir. 2021).

## III.   Defendant's Remaining Counterclaims for Unjust Enrichment, Defamation, Discrimination Under Section 1981

In Colorado, to establish unjust enrichment, Defendant must prove that (1) at Defendant's expense, (2) Plaintiff received a benefit (3) under circumstances that would make it unjust for Plaintiff to retain the benefit without paying. *Stone Creek Bus. Ctr., LLLP v. Stone Creek-Colorado, LLC*, No. 20-cv-01413-PAB-GPG, 2022 WL 4448822, at *2 (D. Colo. Sept. 23, 2022). In Defendant's initial answer to the complaint, he alleged unjust enrichment based on Plaintiff's failure to pay his commission from the date the Contract terminated. ECF 40 at 16-17. Now, Defendant admits that he wasn't entitled to and additional commission payments. ECF 191-2 at 62. Indeed, the Contract provides that Defendant would be only entitled to compensation for any new and renewal business processed up to an including the date of termination of the Contract, and business processed up to the termination date. ECF 192-1 at 8. Defendant does not dispute that the Contract terminated on August 26, 2020, only that he never breached the Contract. ECF 196 at 3. Therefore, I find no genuine issue of material fact as to Defendant's unjust enrichment counterclaim. I recommend granting summary judgment in favor of Plaintiff and denying summary judgment in favor of Defendant for that counterclaim.

Defendant also asserts a counterclaim that Plaintiff's employees and agents defamed him. ECF 40 at 19-20. To establish defamation, Defendant must prove "(1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special

damages or the existence of special damages to the plaintiff caused by the publication." *Edmond v. Pikes Peak Direct Mktg., Inc.*, No. 11-cv-02021-CMA-KLM, 2013 WL 535579, at *6 (D. Colo. Jan. 17, 2013), *report and recommendation adopted*, 2013 WL 505581 (D. Colo. Feb. 12, 2013) (quoting *Walters v. Linhof*, 559 F. Supp. 1231, 1234 (D. Colo. 1983)). Defendant testified at his deposition that several individuals defamed him and relies on the allegations as stated in his counterclaim. Reliance upon self-serving statements from pleadings does not meet the standard for granting summary judgment. To the extent the persons making defamatory statements were other exclusive agents, who are independent contractors rather than employees of Plaintiff, this conduct cannot be attributed to Plaintiff. He also provided in his deposition a handwritten note from a third party that states, "Allstate contacted me stating you was [sic] [t]erminated for crimes you did." ECF 196 at 8; 196-13 at 2. Even if this evidence were reliable (one note is illegible), I find it insufficient to avoid summary judgment. Defendant's Response does not address Plaintiff's arguments or provide any evidentiary support. Therefore, I recommend granting summary judgment as to Count V of the counterclaim.

Finally, Defendant asserts a counterclaim for discrimination under Section 1981, which prohibits racial discrimination in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a)&(b); ECF 40 at 20. Defendant alleges that he is a person of Hispanic origin. ECF 40 at 20; 196-12. To establish a discrimination counterclaim under Section 1981, Defendant must show that Plaintiff "intentionally or purposefully" discriminated against him. *Reynolds v. Sch. Dist. No. 1*, Denver, Colo., 69 F.3d 1523, 1532 (10th Cir. 1995). To meet his burden, Defendant may provide "either direct evidence of discrimination (e.g., oral or written

statements on the part of [Plaintiff] showing a discriminatory motivation) or indirect (*i.e.*, circumstantial) evidence of discrimination." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000).

Here, Defendant cites only one piece of evidence, his own deposition, to support his counterclaim for discrimination. ECF 196 at 8; 196-12. He provides no evidence, apart from his deposition testimony, of statements made by Plaintiff that show an arguable discriminatory motive in terminating him.[5]  ECF 196 at 8. There is no evidence to support that Defendant was treated differently than other EAs whose Contracts were terminated by Plaintiff for cause. ECF 196. And, to the contrary, Plaintiff provides substantial evidence to prove that it terminated the Contract for "unauthorized" brokering after (1) receiving a complaint that Defendant engaged in unauthorized brokering, (2) conducting an internal investigation of the allegations lodged against Defendant, and (3) finding that "[t]he weight of evidence is sufficient to support the conclusion that [Defendant] is brokering for other carriers and he could not provide a credible explanation on his involvement with these carriers." ECF 192-3 at 5; 191-15 at 2; 191-16 at 2; 191-17 at 1. Even

---

[5] When asked the basis of his discrimination claim at his deposition, Plaintiff answered "[u]sing the word "nigger." Using the word "people of color."  "It was general.  The general – generally how the – how everything came about in – in the meetings and everything was you – you – you talk to the white people who you know, your Smith, your Forester, your – those people and everything.  But you go to the other people of color, your Rodriguez or your Cruz, and then you talk to them totally different, and you belittle them."  ECF 196-12 at 2-3. He also refers to other remarks made during the course of his agency. This evidence fails to support a claim for discrimination as it does not show such experiences were connected to or motivated Allstate's decision to terminate the Contract. No reasonable factfinder could find otherwise.  I further note that a hostile work environment on the basis of race has not been alleged, even if Plaintiff were Defendant's employer.

more, Plaintiff provides evidence that there are no cases in which an EA is found to have engaged in unauthorized brokering and has not been terminated. ECF 191-3 at 13.

Because "conclusory and self-serving affidavits" like Defendant's deposition statements carry no weight, they need not be considered on a motion for summary judgment. *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184 (10th Cir. 2015). Defendant provides no direct evidence of a discriminatory motive, indirect evidence of discrimination, or evidence that could lead a reasonable jury to disbelieve Plaintiff's proffered explanation for terminating the Contract. *See Tessler v. KHOW Radio, Inc.*, No. 95-B-2414, 1997 WL 458489, at *3, 7 (D. Colo. Apr. 21, 1997). Without "any significant probative evidence" for Defendant's counterclaim of discrimination under Section 1981, the Court recommends denying summary judgment in favor of Defendant and granting summary judgment in favor of Plaintiff. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## <u>CONCLUSION</u>

After careful consideration of the record, I find there is no genuine dispute of material fact as to any claims.   Accordingly, I make the following recommendations:

As to Plaintiff's claim for breach of contract: Granting Plaintiff's Motion for Partial Summary Judgment as to liability at Count I and denying Defendant's Motion for Summary Judgment as to that claim.

As to Defendant's counterclaims granting Plaintiff's Motion for Summary Judgment as to: (1) Defendant's claim of unjust enrichment (Count II); (2) non-payment of commission (Count III); (3) breach of the implied covenant of good faith and fair dealing (Count IV); (4) defamation

(Count V), and (5) violations of §1981 (Count VI), and denying Defendant's Motion for Summary Judgment on the same.

If this Recommendation is adopted, the claims that remain for adjudication are Plaintiff's Count II and Count III and damages for Count I.

For the foregoing reasons, the Court respectfully recommends granting Plaintiff's Motion [filed October 31, 2022; ECF 191] and denying Defendant's Motion [filed October 31, 2022; ECF 196].[6]

Respectfully submitted this 14th day of April, 2023, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty

Michael E. Hegarty
United States Magistrate Judge

---

[6] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).

# EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
**Judge Nina Y. Wang**

Civil Action No. 20-cv-03139-NYW-MEH

ALLSTATE INSURANCE COMPANY,

      Plaintiff/Counter-Defendant,

v.

JOHN CRUZ,

      Defendant/Counter-Plaintiff.

---

## ORDER ON RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on the Recommendation of United States Magistrate Judge Michael E. Hegarty ("Recommendation"), [Doc. 221, filed April 14, 2023], on the Parties' cross-motions for partial summary judgment. Defendant Counter-Plaintiff John Cruz ("Defendant" or "Mr. Cruz") has submitted pro se Objections to the Proposed Findings and Recommendations in Magistrate's [sic][1] Summary Judgment Order ("Objection"), [Doc. 231, filed May 23, 2023], and Plaintiff Counter-Defendant Allstate Insurance Company ("Plaintiff" or "Allstate") has responded ("Response"), [Doc. 233, filed June 6, 2023]. In the Recommendation, Judge Hegarty recommends that Plaintiff's Motion and Memorandum of Law in Support of its Motion for Summary Judgment ("Plaintiff's Motion"), [Doc. 191, filed October 31, 2022], be granted and that Defendant's Motion for Summary Judgment ("Defendant's Motion"), [Doc. 196, filed October 31, 2022], be denied. For the reasons below, the Court respectfully **OVERRULES in part** Mr. Cruz's Objection, and **ADOPTS in part** the Recommendation, which is incorporated

---

[1] Defendant omits the "Judge" from "Magistrate Judge." The proper title is "Magistrate Judge." 28 U.S.C. § 631.

into this Order by reference as discussed below.  *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## BACKGROUND

The following factual overview is drawn from the record before the Court on summary judgment, including but not limited to the findings of fact in the Recommendation.  *See* [Doc. 221 at 2–9].  Pursuant to an exclusive agency agreement ("Contract"), Mr. Cruz sold Allstate insurance products as an exclusive agent ("EA") in an independent-contractor capacity between 2011 and 2020 in Broomfield, Colorado.  [*Id.* at ¶¶ 2–3, 8; Doc. 191-1 at 2; Doc. 191-2 at 72:1–10, 78:1–9].[2]  In 2012, Defendant's wife launched an independent insurance agency ("CPI") that competed with Allstate.  [Doc. 221 at ¶ 10; Doc. 191-2 at 18:7–15, 34:24–35:6].  In October 2019, Allstate received word that Mr. Cruz was selling insurance products in competition with Allstate, despite his exclusive agency.  [Doc. 221 at ¶ 17; Doc. 191-11 at 2].  Following an internal investigation that indicated that Mr. Cruz was working for CPI, Allstate terminated Mr. Cruz for cause on August 26, 2020.  [Doc. 221 at ¶¶ 18–25; Doc. 192-3 at 2–5; Doc. 191-17 at 2].  Allstate notified the Financial Industry Regulatory Authority ("FINRA") and the Colorado Division of Insurance.  [Doc. 221 at ¶ 38; Doc. 191-21; Doc. 191-22].

After termination of the Contract, Mr. Cruz was afforded 90 days to sell his economic interest in his book of business.  [Doc. 221 at ¶ 28; Doc. 191-17 at 2].  In the alternative, Allstate would ordinarily have paid Mr. Cruz a termination payment ("TPP").  [Doc. 221 at ¶ 29; Doc. 192-1 at 9].

---

[2] When citing to a deposition transcript, this Court refers to the docket number assigned by the United States District Court for the District of Colorado's Electronic Case Files ("ECF") system, but the page and line number of the original transcript, for the purpose of consistency.

A month after his termination, Mr. Cruz sent an email soliciting business for CPI to a list of customer email addresses obtained through Allstate.  [Doc. 221 at ¶¶ 35–36; Doc. 191-27 at 2–3; Doc. 205-11 at 198:11–17].  Mr. Cruz also failed to return his agency phone number to Allstate, as required by the Contract.  [Doc. 221 at ¶¶ 30, 33; Doc. 191-1 at 9; Doc. 191-25 at ¶¶ 2–4].  Allstate took the position that any TPP was contingent on Mr. Cruz's compliance with the Contract's post-termination restrictive covenants related to non-solicitation, confidentiality, and returning Allstate's property.  [Doc. 221 at ¶¶ 34, 37; Doc. 191-17 at 2].

On October 20, 2020, Allstate filed suit against Mr. Cruz.  [Doc. 1].  Its Verified Complaint for Injunctive and Other Relief (Jury Demand) ("Complaint") includes three causes of action: (1) breach of contract ("Count I"); (2) violation of the federal Defend Trade Secrets Act ("Count II"); and (3) violation of the Colorado Uniform Trade Secrets Act ("Count III").  [*Id.* at 14–21].  Allstate sought injunctive and damages relief, [*id.* at 21–22], although preliminary injunctive relief was denied, [Doc. 59].  On February 5, 2021, Mr. Cruz filed his Answer to Complaint and Counterclaims with Jury Demand ("Answer"), in which he brought six counterclaims: (1) breach of contract based on nonpayment of commissions ("Counterclaim I"); (2) unjust enrichment based on nonpayment of commissions ("Counterclaim II"); (3) breach of contract based on nonpayment for agency termination, i.e., TPP ("Counterclaim III"); (4) breach of the implied covenant of good faith and fair dealing ("Counterclaim IV"); (5) defamation ("Counterclaim V"); and (6) discrimination in violation of 42 U.S.C. § 1981 ("Counterclaim VI").  [Doc. 40 at 15–22].

Both Parties have filed motions for partial summary judgment.  Allstate seeks summary judgment on its claim for breach of contract (solely as to liability) and on all Mr. Cruz's counterclaims.  *See* [Doc. 191 at 40].  Mr. Cruz seeks summary judgment on the same claims in his favor.  *See* [Doc. 196]; *see also* [Doc. 221 at 2 n.1 (Judge Hegarty observing that, "[a]lthough

Defendant states he is seeking summary judgment on all of Plaintiff's claims, he does not address" Allstate's federal and state trade-secrets claims)].  Neither of the Parties' motions seeks summary judgment with respect to Allstate's trade-secrets claims.  The Court referred these motions to the Honorable Michael E. Hegarty.  [Doc. 200].  Judge Hegarty issued his Recommendation on April 14, 2023.  In the Recommendation, Judge Hegarty thoroughly analyzes the issues, and recommends granting Plaintiff's Motion and denying Defendant's Motion.  *See* [Doc. 221 at 26–27].  Defendant filed his Objection on May 23, 2023, [Doc. 231], and Plaintiff responded on June 6, 2023, [Doc. 233].

## LEGAL STANDARDS

### I.     Review of a Magistrate Judge's Recommendation

Pursuant to Fed. R. Civ. P. 72(b)(3), this Court reviews de novo any part of the magistrate judge's recommendation that is properly objected to.  An objection is proper only if it is sufficiently specific "to focus the district court's attention on the factual and legal issues that are truly in dispute." *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996). "Where an objection is not made or is made improperly, the Court has discretion to review the recommendation under whatever standard it deems appropriate." *Smith v. Krieger*, 643 F. Supp. 2d 1274, 1279 (D. Colo. 2009) (citing *Summers v. Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991)).

In addition, the Court affords Defendant's filings liberal construction because he proceeds pro se. *See Haines v. Kerner*, 404 U.S. 519, 520–21 (1972).  Liberal construction "means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  Defendant's pro se status, however, does not excuse him from complying with the substantive law and procedural rules that

govern all civil actions filed in this District.  *See Murray v. City of Tahlequah*, 312 F.3d 1196, 1199 n.3 (10th Cir. 2002).  The Court plays a neutral role in the litigation process and cannot assume the role of an advocate for the pro se party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998).

## II.     Summary Judgment under Federal Rule of Civil Procedure 56

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (quotations omitted).  It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial.  *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  At all times, the Court will "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."  *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016).

To satisfy its burden at summary judgment, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient.  *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *see also* 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 (4th ed. Apr. 2023 update) (explaining that the nonmovant cannot rely on "mere reargument of a party's case or the denial of an opponent's allegation" to defeat summary judgment).  In considering the nonmovant's evidence, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d

1147, 1165 (10th Cir. 2008).  Further, the Court may consider only admissible evidence, *see Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995), though the evidence need not be in a form that is admissible at trial—only the substance must be admissible at trial.  *See Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016).  For instance, "if th[e] evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005).  Indeed, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

Finally, "[c]ross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard, with each motion viewed in the light most favorable to its nonmoving party." *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019); *see also Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

## ANALYSIS

## I.     The Recommendation

The Recommendation's factual findings largely reflect Allstate's statement of undisputed facts, deeming Defendant's challenges to them deficient.  *See* [Doc. 221 at 2–9].  Judge Hegarty explains that he "ha[s] considered [Mr. Cruz's] responses" to Allstate's statements of fact, and "find[s] the summary in Plaintiff's reply brief to be an accurate accounting of the deficiencies of Defendant's responses under Fed. R. Civ. P. 56(c), the Court's Civil Practice Orders and Standards, and applicable case law." [*Id.* at 2 n.2 (citation omitted)]; *see also* [Doc. 209 at 2–5].

6

In Plaintiff's Reply in Support of its Motion for Summary Judgment ("Reply"), Allstate contended that Mr. Cruz's response to Allstate's statement of facts was "fatally flawed" because nearly every fact was either (1) "not responded to by Cruz at all"; (2) met with "conclusory responses" that "d[id] not contain any citations to evidence"; (3) addressed by general citations to entire deposition transcripts; or (4) "supported only by a conclusory, self-serving affidavit which merely reiterates [Mr. Cruz's] allegations in this case, is not based on personal knowledge, fails to cite to supporting evidence, and contradicts other evidence." [Doc. 210 at 2]. Agreeing with Allstate's assessment, Judge Hegarty takes Allstate's summary in the Reply as accurate as to the extent to which Allstate's facts are disputed and proceeds to the legal issues presented.

Starting with Allstate's claim for breach of contract, Judge Hegarty recommends entering summary judgment in Allstate's favor—as to liability—because it is undisputed that Mr. Cruz violated the post-termination restrictive covenants at issue, including by competing with Allstate from the same location he used as an EA and soliciting its customers. [Doc. 221 at 18].[3] Judge Hegarty rejects Mr. Cruz's argument that the relevant restrictive covenants are void under Colorado law, finding instead that they fall within an exception related to preserving trade secrets. [Id. at 16–18]. Judge Hegarty also concludes that the plain language of the Contract required Mr. Cruz to return Allstate's phone number upon the termination of his exclusive agency, and there was no genuine issue of material fact as to whether he did so—at least not without authority suggesting that Mr. Cruz's actions could constitute substantial performance or render the breach non-material. [Id. at 14].

---

[3] For the same reason, Judge Hegarty recommends denying summary judgment in Mr. Cruz's favor. See [Doc. 221 at 26].

Next, Judge Hegarty turns to Mr. Cruz's six counterclaims, recommending summary judgment be entered in Allstate's favor as to all.  On Counterclaim I for breach of contract, Judge Hegarty notes that Mr. Cruz admitted that he received the final commission payment that the claim places at issue.  [*Id.* at 22–23].  On Counterclaim III for breach of contract, Judge Hegarty reasons that Allstate exercised its contractual right not to pay Mr. Cruz for terminating the agency because Mr. Cruz breached valid restrictive covenants.   [*Id.* at 22].   For similar reasons, the Recommendation rejects Mr. Cruz's unjust enrichment theory presented in Counterclaim II.  [*Id.* at 23].  With respect to Counterclaim IV, alleging a violation of the implied covenant of good faith and fair dealing, Judge Hegarty concludes that (1) the covenant cannot displace the Contract's "clear" termination provisions; and (2) Mr. Cruz fails to show that the covenant applies to Allstate reporting his termination to FINRA and the State of Colorado.  [*Id.* at 20–21].  Finally, Judge Hegarty determines that Counterclaims V and VI for defamation and discrimination should fail because Mr. Cruz relies on conclusory and self-serving statements and fails to address Allstate's arguments or make the showings required by applicable law.  [*Id.* at 23–26].

In sum, Judge Hegarty recommends granting summary judgment in Allstate's favor on every theory at issue in Plaintiff's Motion and Defendant's Motion, which would leave the only issues remaining for adjudication in this case as (1) damages for Allstate's breach of contract claim and (2) Allstate's remaining claims under federal and state trade-secrets law.  *See* [*id.* at 27].

## II.   Discussion

For the reasons that follow, the Court **GRANTS** summary judgment in Plaintiff's favor on Defendant's Counterclaims I, II, III, IV, V, and VI.  The Court **DENIES** Defendant's request for summary judgment on those counts.  The Court also **GRANTS** summary judgment on Plaintiff's Count I, only as to liability, and only to the extent it is based on Defendant's retention of Plaintiff's

phone number.  The Court thus leaves Plaintiff's Counts II and III, as well as damages for Count I, for trial.  The Court also **RESERVES** for trial Defendant's liability under Count I, to the extent it is based on his alleged violation of various non-competition covenants, the validity of which turns on disputed issues of fact.  Plaintiff's Motion is thus respectfully **GRANTED in part**, while Defendant's Motion is respectfully **DENIED**.

A.    **Scope of Defendant's Objection**

This Court first determines the scope of Defendant's Objection, as "a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *One Parcel of Real Prop.*, 73 F.3d at 1060.  Such specific objections permit "the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Id.* at 1059 (quotation omitted).

As an initial matter, Mr. Cruz's Objection cannot be fairly read to object to Judge Hegarty's conclusion that summary judgment in favor of Allstate be granted on: Counterclaim I for breach of contract based on nonpayment of commissions; Counterclaim II for unjust enrichment based on nonpayment of commissions; Counterclaim IV for breach of the implied covenant of good faith and fair dealing; Counterclaim V for defamation; and Counterclaim VI for discrimination in violation of 28 U.S.C. § 1981.  *Compare* [Doc. 221 at 21–26], *with* [Doc. 231].  This Court has reviewed the Recommendation with respect to these counterclaims, finds it thorough and well-reasoned, and finds no clear error.  *Smith*, 643 F. Supp. 2d at 1279.  Thus, the Recommendation is **ADOPTED** with respect to Counterclaims I, II, IV, V, and VI.

Though not entirely clear, Mr. Cruz seems to pursue three principal lines of argument in his Objection.  First, throughout the bulk of the Objection, he attempts to create genuine disputes

of material fact by rebutting Judge Hegarty's factual findings, point-by-point, with counterstatements of fact and citations to record materials. *See* [Doc. 231 at 5–38].[4]  Second, Mr. Cruz argues that the Recommendation errs by finding that a restrictive covenant whose text does not mention trade secrets was meant to protect trade secrets, and is therefore enforceable under Colorado law in Plaintiff's breach of contract claim.  [*Id.* at 3–4].  Third, Mr. Cruz appears to contend that, because he was not properly terminated for cause, the Recommendation incorrectly concludes that Counterclaims III and IV fail. *See, e.g.*, [*id.* at 8–15].

### B.    Challenge to Undisputed Facts

This Court first considers whether Judge Hegarty appropriately adopted Allstate's statement of facts as undisputed.  In its Reply, Allstate specifically identified the statements of fact that it contended that Mr. Cruz did not properly address in his Response to Plaintiff's Motion for Summary Judgment ("Defendant's Response"), [Doc. 209]:

> Nos. 1, 3, 11, 16, 18-22, 25-26, 30-31, 37-40, 42, 47-48, 51-55, 57-68, 73-76, 79-80 are not responded to by Cruz at all.
>
> Nos. 2, 17, 23, 24, 32, 34-36, 43-45, 72, 77, 78 contain conclusory responses but do not contain any citations to evidence to support such responses.
>
> Nos. 4, 5, 7-15, 27, 28, 33, 41, 46, 50, 81, 82 do not cite to the record for any particular evidence but rather state "see all depositions" or cite to full depositions transcripts without any reference to specific testimony.
>
> Nos. 69-71 are supported only by a conclusory, self-serving affidavit which merely reiterates [Mr. Cruz's] allegations in this case, is not based on personal knowledge, fails to cite to supporting evidence, and contradicts other evidence in this case.

[Doc. 210 at 2].

---

[4] Allstate responds that Mr. Cruz has waived review on this matter and that, even if the Court reaches the asserted factual disputes, they suffer from many of the same defects that led Judge Hegarty to find waiver or are otherwise not genuine or material.  *See* [Doc. 233 at 7–11].

In his Objection, Mr. Cruz takes issue with Judge Hegarty's acceptance of Allstate's proffer of undisputed facts. But Mr. Cruz acknowledges in his Objection:

> On summary judgment, <u>the court has no duty to search the record on behalf of a litigant to find evidence supporting the litigant's summary judgment interests</u>. See *Cross v. Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (explaining that, on a motion for summary judgment, "'it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without . . . depending on the trial court to conduct its own search of the record'" and the district court has no obligation "to comb the record in order to make [the plaintiff's] arguments for him'" (first quoting *Downes v. Beach*, 587 F.2d 469, 472 (10th Cir. 1978); then quoting *Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000)).

[Doc. 231 at 3 (emphasis added)]. Mr. Cruz offers no authority to suggest that Judge Hegarty did not properly apply this standard in finding that Mr. Cruz waived review of any potential factual disputes by failing to properly support his denials of Allstate's proffer of undisputed facts that were supported by record citations. *See generally* [*id.*]; *see also* [Doc. 221 at 2 n.2].

Furthermore, after review of Defendant's Response, this Court respectfully concludes that Mr. Cruz failed to adequately support his supposed disputes of fact, just as Judge Hegarty found. *See* [Doc. 209 at 2–5]. In some instances, Defendant cited "[a]ll depositions and documents." *See, e.g.*, [*id.* at ¶ 6 (emphasis omitted)]. A citation to "all depositions," with nothing more, is plainly contrary to the controlling authority that Mr. Cruz acknowledges: Rule 56 requires a party contesting a fact to cite to "*particular* parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c)(1)(A) (emphasis added); and this Court's Civil Practice Standards contain similar instructions, *see* Civ. Practice Standard 7.1D(b)(4) ("Any denial shall be accompanied by a brief factual explanation of the reason(s) for the denial and *a specific reference to material in the record* supporting the denial." (emphasis added)).

Similarly, in response to Plaintiff's undisputed fact that "EAs exclusively sell Allstate products; they cannot sell insurance products from insurance carriers other than Allstate, except in limited circumstances and only if those products from other carriers are pre-approved by Allstate through Allstate's Ivantage program," [Doc. 191 at ¶ 4], Mr. Cruz asserted: "EA's [sic] do not exclusively sell Allstate Products. EA's [sic] also sell customer info to other individuals who then sell products with EA's [sic] help," [Doc. 209 at ¶ 3]. In doing so, he cited "all depositions," and, more specifically, Exhibits A, B, C, D, E, F, G, K, O, and S. [*Id.*]. Mr. Cruz's citation to Exhibits A, B, C, D, E, F, G, K, O, and S fares no better than his citation to "all depositions." These exhibits appear to consist of unedited deposition transcripts. Exhibit A, for example, is a deposition of Elise Teague ("Ms. Teague"), a senior sales manager at Allstate. [Doc. 209-1 at 6:8]. As with every other deposition cited, Mr. Cruz pointed to no specific testimony by Ms. Teague addressing EAs. *See* [Doc. 209 at ¶ 3]. This Court's brief review of the 123-page transcript of Ms. Teague's deposition also yields no information about whether EAs exclusively sell Allstate products. *See generally* [Doc. 209-1]. Indeed, Ms. Teague testified as follows:

> **Q (Mr. Cruz):** If a customer -- or if a potential customer contacts Allstate for insurance and they don't like the price that Allstate has, is that agent allowed to refer them out?
>
> **A (Ms. Teague):** If it can still be written through Allstate, then no, they should not be referring that out.

[*Id.* at 63:14–19]. Similarly, during the deposition of Richard Poduska ("Mr. Poduska"), Zone Operations Leader for Allstate, Mr. Poduska testified to the difference between permissible referrals, when customers are not eligible for any Allstate products offered through EAs, and brokering, where an agent has a financial interest in another insurance agency or business. [Doc. 209-2 at 5:19, 8:14–10:12]. Even the deposition excerpts cited in Mr. Cruz's Objection—not

before Judge Hegarty—do not directly address whether EAs were permitted to sell insurance products from insurance carriers other than Allstate. *See* [Doc. 231 at 6–7].

While this Court construes Mr. Cruz's filings liberally, "such liberal construction is intended merely to overlook technical formatting errors and other defects in [a pro se litigant's] use of legal terminology and proper English." *Dodson v. Bd. of Cnty. Comm'rs*, 878 F. Supp. 2d 1227, 1235 (D. Colo. 2012). Defendant must still comply with the substantive law and procedural rules applicable to his case. *See id.* Applying those standards, this Court respectfully concludes that Judge Hegarty appropriately found the statements of fact proffered by Allstate, which were not properly disputed by Mr. Cruz, to be undisputed for purposes of summary judgment. *See* Fed. R. Civ. P. 56(e)(2).

### C.   Defendant's Breach of Post-Termination Obligations

The Court now turns to whether summary judgment in favor of Allstate is proper, in whole or in part, on its claim for breach of contract based on Mr. Cruz retaining his agency telephone number and soliciting Allstate customers after his separation from Allstate. *See* [Doc. 191 at 17 ("Thus, the only questions for purposes of summary judgment on Allstate's breach of contract claim are whether the undisputed facts establish that Cruz breached his post-termination obligations to Allstate and whether Allstate was damaged by Cruz's actions.")].

### 1.   Continued Use of Telephone Number

Defendant does not object to Judge Hegarty's determination that the Contract required him to return the telephone number associated with his Allstate business after the Contract was terminated, and there is no genuine issue of material fact as to whether he did so. *Compare* [Doc. 221 at ¶ 33 (citing [Doc. 191-24 at 1; Doc. 191-23 at 2; Doc. 191-25 at 2])], *with* [Doc. 231 at 27–28]. This Court has reviewed Judge Hegarty's determination with respect to Defendant's breach

of contract liability based on this theory and finds no clear error. *Smith*, 643 F. Supp. 2d at 1279. This material breach alone is sufficient to find in favor of Allstate with respect to (1) the Parties' cross-motions for summary judgment on Allstate's Count I for breach of contract based on Defendant's violation of post-termination obligations, and (2) Defendant's Counterclaim III for breach of contract, insofar as Mr. Cruz asserts that Allstate breached the Contract by not tendering TPP. *See* [Doc. 221 at 19]. Because Allstate's damages will likely turn on the extent, not the fact, of Mr. Cruz's liability, the Court proceeds to the remainder of Plaintiff's breach of contract claim.

### 2.  Non-Solicitation Obligations

The Contract between Mr. Cruz and Allstate provides that, "[f]or a period of one year following termination," Mr. Cruz is prohibited from "solicit[ing] the purchase of products or services in competition with those sold by [Allstate]":

(1)  With respect to any person, company, or organization to whom you or anyone acting on your behalf sold insurance or other products or services on behalf of [Allstate] and who is a customer of [Allstate] at the time of termination of the Agreement;

(2)  With respect to any person, company, or organization who is a customer of [Allstate] at the time of termination of this Agreement and whose identity was discovered by you as a result of your status as [an Allstate] agent or as a result of your access to confidential information of [Allstate]; or

(3)  From any office or business site located within one mile of the agency sales location maintained pursuant to Section V. of this Agreement at the time this Agreement is terminated.

In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision . . . conflicts with any existing law, it will be applied to the extent permitted by such law.

[Doc. 191-1 at 9–10].

As recognized by Judge Hegarty, Colo. Rev. Stat. § 8-2-113, as in force at the time of the termination of the Contract[5] on August 26, 2020, provided that "[a]ny covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void" unless the party seeking to enforce it can show that the covenant fits into one of four defined statutory exceptions: (1) "[a]ny contract for the purchase and sale of a business or the assets of a business"; (2) "[a]ny contract for the protection of trade secrets"; (3) "[a]ny contractual provision providing for recovery of the expense of educating and training an employee who has served an employer for a period of less than two years"; and (4) "[e]xecutive and management personnel and officers and employees who constitute professional staff to executive and management personnel."[6] Colo. Rev. Stat. § 8-2-113(2) (2020); *Haggard v. Spine*, No. 09-cv-00721-CMA-KMT, 2009 WL 1655030, at *4 (D. Colo. June 12, 2009) (citing *DBA Enters. v. Findlay*, 923 P.2d 298, 302 (Colo. App. 1996)).  Colorado treats non-solicitation clauses as covenants not to compete.  *See, e.g.*, *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 526 (Colo. App. 2011).

In the Recommendation, Judge Hegarty agrees with Allstate's contention that the provisions of the Contract excerpted above are enforceable against Mr. Cruz because they are "for the protection of trade secrets" under Colo. Rev. Stat. § 8-2-113(2)(b) (2020).  *See* [Doc. 221 at

---

[5] Since that time, Colo. Rev. Stat. § 8-2-113 has been amended, effective August 10, 2022. However, the amendments are not retroactive.  *See* H.B. 22-1317, 73d Gen. Assemb., Reg. Sess., § 2(2) (Colo. 2022).  Whether a statutory exception applies is determined as of the time of the employee's departure.  *See Wells Fargo Ins. Servs. USA, Inc. v. McQuate*, 276 F. Supp. 3d 1089, 1104–05 (D. Colo. 2016).

[6] The Parties do not dispute, and Defendant does not object to, the application of Colorado law to the interpretation of the Contract.  *See* [Doc. 231].  Thus, because the Parties assume that Colorado law applies, this Court will assume the same.  *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

15–18].  Mr. Cruz objects, arguing (1) that Allstate never made any trade secrets-related argument or claim in its Motion for Partial Summary Judgment, as a procedural matter; and (2) that Allstate has failed to establish that the trade-secrets exception applies, as a substantive matter.  *See* [Doc. 231 at 3–4].

*Procedural Objection.*  Mr. Cruz is correct that Allstate did not discuss the enforceability of the Contract's post-termination non-solicitation provisions under the statutory exception for protecting trade secrets in its affirmative motion.  *See generally* [Doc. 191].  But once Mr. Cruz raised the validity of the non-compete provisions in opposing partial summary judgment, [Doc. 209 at ¶¶ 41–42], Allstate addressed the issue in its Reply, [Doc. 210 at 8–10].  The Federal Rules of Civil Procedure do not provide for a sur-reply as of right, Judge Hegarty did not sua sponte grant leave to file one, and Mr. Cruz did not seek leave to file one.  *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998).  To the extent that Mr. Cruz has any concern regarding whether the enforceability of the post-termination non-solicitation provisions under the trade-secrets exception was properly before Judge Hegarty, any such concern is now obviated by this Court's de novo review of this issue.

*Substantive Objection.*  For the statutory exception to apply, the purpose of the non-solicitation provisions at issue must be "the protection of trade secrets, and the covenant must be reasonably limited in scope to the protection of those trade secrets."  *Wells Fargo Ins. Servs. USA, Inc. v. McQuate*, 276 F. Supp. 3d 1089, 1108 (D. Colo. 2016) (quotation omitted).  Courts look to the relevant contract to determine whether the covenant not to compete was drafted with the purpose of protecting trade secrets.  *See Haggard*, 2009 WL 1655030, at *5 (citing *Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 910 (Colo. App. 1997)).  To do so, courts apply a two-prong test.  A court "first examine[s] the factual situation to determine whether a restrictive

covenant is justified at all." *Saturn Sys., Inc.*, 252 P.3d at 526 (quoting *Mgmt. Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 766 (Colo. App. 1988)). Next the court "examine[s] the specific terms of the noncompetition clause to determine the reasonableness of their effect." *Id.* (quoting *Mgmt. Recruiters of Boulder*, 762 P.2d at 766). Generally, "an agreement not to solicit an employer's customers is enforceable so long as its purpose is to protect the employer's trade secrets and it is reasonably limited in time and geographic scope." *See id.* (citing *Gold Messenger*, 937 P.2d at 910–11; *Mgmt. Recruiters of Boulder*, 762 P.2d at 766). Under Colorado law, a "trade secret" is defined as "the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, *listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value.*" *zvelo, Inc. v. Akamai Techs., Inc.*, No. 19-cv-00097-PAB-SKC, 2019 WL 4751809, at *2 (D. Colo. Sept. 30, 2019) (citing Colo. Rev. Stat. § 7-74-102(4)) (emphasis added).

Based on the record before the Court, there is no genuine issue of material fact that Mr. Cruz contacted Allstate customers through an email after the Contract was terminated. *See* [Doc. 221 at ¶ 35; Doc. 191-27 at 2–3]. Indeed, Mr. Cruz does not challenge that factual finding in his Objection. *See* [Doc. 231 at 28]. However, "[f]or [a noncompetition provision] to be a contract aimed at protecting trade secrets, a trade secret must exist." *Great Am. Opportunities, Inc. v. Kent*, 352 F. Supp. 3d 1126, 1134 (D. Colo. 2018) (citing *Porter Indus., Inc. v. Higgins*, 680 P.2d 1339, 1342 (Colo. App. 1984)); *see also DoubleClick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1257 (D. Colo. 2005) ("In order to fall under this exception, DoubleClick must show that it possesses trade secrets that are worth protecting, and that Paikin had access to these secrets."); *cf. 23 LTD v. Herman*, 457 P.3d 754, 757 (Colo. App. 2019). And "[t]he existence of a trade secret is a question

of fact." *Ball Dynamics Int'l, LLC v. Saunders*, No. 16-cv-00482-NYW, 2016 WL 10859782, at *5 (D. Colo. Nov. 14, 2016).

Judge Hegarty concludes, without objection, that neither Plaintiff's Motion nor Defendant's Motion seeks summary judgment on Plaintiff's claims under federal or state trade-secrets law. [Doc. 221 at 1, 2 n.1]. The Parties have not stipulated to the existence of any trade secrets. Far from it, they dispute the extent to which Allstate has protectible trade secrets for purposes of applying the exception. *Compare* [Doc. 231 at 13, 29–30; Doc. 196 at 8–9], *with* [Doc. 233 at 8]. In his Response to Allstate's Motion for Partial Summary Judgment, Mr. Cruz repeatedly contended that Allstate has no confidential information and that he purchased public information. *See, e.g.*, [Doc. 209 at ¶¶ 6–11]. Construing Mr. Cruz's pro se filing liberally, as it must, this Court views this argument as challenging whether Allstate's customer information constitutes a protectible trade secret. "Because whether the noncompetition and non-solicitation clauses are enforceable depends on whether a trade secret exists, this issue cannot be resolved at the summary judgment stage." *Great Am. Opportunities*, 352 F. Supp. 3d at 1135; *see also id.* at 1136 ("[T]he first prong [of the trade-secrets exception] is a disputed question of fact for trial."). The Court therefore respectfully **RESERVES** for trial Plaintiff's claim for breach of contract based on the post-termination solicitation of Allstate customers, as it is not appropriate for adjudication on summary judgment. The Court **DECLINES TO ADOPT** Judge Hegarty's Recommendation insofar as it recommends summary judgment in favor of Allstate based on his solicitation of Allstate customers after the termination of the Contract.

### D. Termination for Cause

Finally, this Court turns to Mr. Cruz's arguments in his Objection challenging the termination of the Contract and asserting that "Plaintiff was not allowed to terminate Defendant

by law." [Doc. 231 at 20]; *see also* [*id.* at 20–28]. Mr. Cruz suggests that Allstate did not properly terminate the Contract for cause because he was permitted to have an outside business as an independent agency approved by Allstate. [*Id.* at 18–19]. Mr. Cruz also argues that he was permitted to refer customers to outside agencies in exchange for gift cards. [*Id.* at 19–20]. Last, Mr. Cruz suggests that he is a whistleblower who uncovered criminal activity involving Allstate and that his termination violated a host of federal laws. *See* [*id.* at 10, 20–24]; *see also, e.g.*, [*id.* at 24 ("Plaintiff[] terminated Defendant due to Defendant['s] complaint about illegal activities taking place at Allstate.")].[7]  It is not entirely clear which claims or counterclaims these arguments are meant to cover. Because the Court finds these arguments meritless, however, the Court need not attempt to classify them.

**Independent Agency.**  Mr. Cruz insists that he was an "independent agent" rather than an "exclusive agent," [*id.* at 5–6], and thus was permitted to sell policies for other insurance companies. However, Mr. Cruz admits that he executed an Allstate Exclusive Agency Agreement, i.e., the Contract, effective April 1, 2010. [Doc. 40 at 1, ¶ 1]. Indeed, he relies on the Contract for his counterclaims. *See* [*id.* at 8–22]. The Contract plainly states: "You will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of [Allstate]." [Doc. 191-1 at 2]. Any argument that Allstate improperly terminated the Contract based on this theory is misplaced.

---

[7] Allstate responds that the notion that it violated any federal statutes is being presented for the first time in the Objection and is devoid of factual support. [Doc. 233 at 11]; *see also* [Doc. 221 at 21 n.4 (Judge Hegarty discussing the whistleblower issue in the Recommendation and noting that Mr. Cruz "provides no evidence" in support, and "has not brought a claim for retaliation under Title VII, which would not lie in any event given his independent contractor status")].

19

***Whistleblower Allegations.*** In the Recommendation, Judge Hegarty notes that "Defendant continually asserts that his Contract with Plaintiff was terminated because he is a whistleblower . . . [b]ut again, he provides no evidence to support this allegation." [Doc. 221 at 21 n.4]. In the briefing on Plaintiff's Motion, Mr. Cruz invoked the Sarbanes-Oxley Act but did not adduce any evidence to create a genuine issue of material fact based on a theory that Allstate breached the Contract by terminating him. [Doc. 209 at ¶ 47]. This Court finds no basis in the Objection to conclude otherwise.

Similarly, Mr. Cruz argues in his Objection that Allstate's practice whereby EAs may receive gift cards in exchange for referrals is in violation of federal mortgage laws. In the Recommendation, Judge Hegarty found that "there is no genuine issue of material fact that occasionally an Allstate EA may receive a gift card from independent agencies as a thank you for [a customer] referral." [Doc. 221 at 18]. Again, the Court does not find error in Judge Hegarty's conclusions regarding the effect of this practice on the motions for summary judgment.[8]

Other arguments in Mr. Cruz's Objection, such as that he uncovered "Tax Evasion, Tax Fraud, Wire Fraud, Security and Exchange Commission, Cyber Crimes, RESPA Violations," or other conduct implicating various whistleblower protection laws, and precluding the termination of the Contract, were not raised in Defendant's Motion or Defendant's Response to Plaintiff's Motion. *Compare* [Doc. 231 at 20–23], *with* [Doc. 196], *and* [Doc. 209]. Pursuant to the controlling authority of the United States Court of Appeals for the Tenth Circuit, "theories raised for the first time in objections to the magistrate judge's report are deemed waived." *United States v. Garfinkle*, 261 F.3d 1030, 1031 (10th Cir. 2001) (citing *Marshall v. Chater*, 75 F.3d 1421, 1426

---

[8] Mr. Cruz also suggests that the referral practice undermines Allstate's assertion of a trade secret. *See, e.g.*, [Doc. 231 at 29]. As discussed above, the Court reserves the factual issue whether Allstate has a trade secret for trial, at which point Mr. Cruz may press the argument further.

(10th Cir. 1996)).   Thus, this Court respectfully declines to substantively consider these new arguments.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that:

(1)     Defendant's Objections to the Proposed Findings and Recommendations in Magistrate's [sic] Summary Judgment Order [Doc. 231] are **OVERRULED in part**;

(2)     This Court **ADOPTS in part** and **DECLINES TO ADOPT in part** the Recommendation of United States Magistrate Judge Michael E. Hegarty [Doc. 221];

(3)     Plaintiff's Motion and Memorandum of Law in Support of its Motion for Summary Judgment [Doc. 191] is **GRANTED in part** and **DENIED in part**;

(4)     Defendant's Motion for Summary Judgment [Doc. 196] is **DENIED**;

(5)     A Telephonic Status Conference is **SET** for **October 17, 2023**, at **10:00 a.m.**, for the purpose of setting a Final Pretrial/Trial Preparation Conference and trial in this matter.   The Parties shall participate using the following dial-in information: 888-363-4749; Access Code: 5738976#; and

(6)     The Clerk of Court is **DIRECTED** to mail a copy of this Order to:

John Cruz
408 Widgeon Drive
Longmont, CO 80503

DATED: September 20, 2023

BY THE COURT:

Nina Y. Wang
United States District Judge

EXHIBIT 6

1

```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2

3    CIVIL ACTION NO. 20-cv-03139-NYW-MEH

4    _____

5    ALLSTATE INSURANCE COMPANY,

6              Plaintiff and Counter Defendant,

7    v.

8    JOHN CRUZ,

9              Defendant and Counter Claimant.

10   _____

11             Proceedings before MICHAEL E. HEGARTY, United

12   States Magistrate Judge, for the District of Colorado,

13   commencing at 10:58 a.m. on March 5, 2024in the United

14   States Courthouse, Denver, Colorado.

15   _____

16   WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE

17   HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18   _____

19                        APPEARANCES

20             SCOTT HUMPHREY, Attorney at Law, appearing on

21   behalf of the Plaintiff/Counter Defendant.

22             JOHN CRUZ, Pro Se, appearing on behalf of the

23   Defendant/Counter Claimant.

24   _____

25                  TELEPHONIC STATUS CONFERENCE
```

2

1            P R O C E E D I N G S

2            (Whereupon, the electronically recorded

3    proceedings are herein transcribed, pursuant to order of

4    counsel.)

5            (Audio begins at 11:32 a.m.)

6            THE COURT:  Back on the record, 20-cv-3139.  Court

7    has engagedgauged in off-the-record discussions, and so just

8    want to read into the record our resolution of the case.

9    Both parties agree to dismiss all claims that were or could

10   have been brought in this lawsuit with prejudice.  And

11   that's the extent of the agreement.

12           Is that your agreement on behalf your client, Mr.

13   Humphrey?

14           MR. HUMPHREY:  We would also add -- or ask, Your

15   Honor, that the settlement itself be confidential.

16           THE COURT:  Well, this is -- I mean, the fact of

17   settlement can't be because -- well --

18           MR. HUMPHREY:  We're --

19           THE COURT:  I -- this isn't exactly a settlement.

20   I mean, I would say this -- this is just simply a simple

21   dismissal, so...

22           MR. HUMPHREY:  Right.  But -- I mean,

23           (indiscernible) objection of the terms of the

24   settlement being confidential the parties, you know -- what

25   we don't want to do is we don't want to see Mr. Cruz

3

```
1    publishing that, you know, this case is dismissed and you

2    know, et cetera, et cetera.  I mean, the case is --

3              THE COURT:  Well --

4              MR. HUMPHREY:  -- dismissed, but --

5              THE COURT:  -- I think the parties can --

6              MR. HUMPHREY:  -- you know, I'm not --

7              THE COURT:  -- all say, "We resolved our

8    differences.  We did and walked away."

9              Can you live with that, Mr. Cruz?

10             MR. CRUZ:  That's it, yes.

11             THE COURT:  Yeah.  That's all.  We've resolved --

12             MR. HUMPHREY:  Okay.  That's fine.

13             THE COURT:  All that can be said is, "We resolved

14   our differences and we agreed to the" -- "dismiss the case,"

15   okay?

16             MR. CRUZ:  Yes.

17             THE COURT:  Fair.  Good, Mr. Humphrey?

18             MR. HUMPHREY:  Good.  Thank you, Your Honor.

19             THE COURT:  Thank you for your appearance today.

20   And, Mr. Cruz, that's your agreement?

21             MR. CRUZ:  Yes.

22             THE COURT:  Okay.  Thank you, guys.  Everybody

23   take care.

24             MR. CRUZ:  Have a good day.

25             MR. HUMPHREY:  Thank you, Your Honor.
```

4

1           THE COURT:  All right.  Bye-bye.

2           (Whereupon, the proceedings concluded at 11:33

3    a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1          TRANSCRIBER'S CERTIFICATE

2          I certify that the forgoing is a correct

3    transcript, to the best of my knowledge and belief (pursuant

4    to the quality of the recording) from the record of

5    proceeding in the above-entitled matter.

6    /s/Brittany Payne                    April 1, 2024

7    Signature of Transcriber               Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com