IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang

Civil Action No. 24-cv-00933-NYW-MEH

ALLSTATE INSURANCE COMPANY,

      Plaintiff,

v.

JOHN CRUZ, and
PIP PERSONAL IDENTITY PROTECTION, LLC,

      Defendants.

---

## ORDER

---

This matter comes before the Court on Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (the "Motion for TRO"), [Doc. 8, filed April 12, 2024], and Plaintiff's Motion for Expedited Discovery (the "Motion to Expedite"), [Doc. 7, filed April 10, 2024], both filed by Plaintiff Allstate Insurance Company ("Plaintiff" or "Allstate"). The Court heard oral argument on the Motion for TRO on April 23, 2024, and took the Motion to Expedite under advisement. Upon review of the Parties' briefing, the entire docket, and the applicable case law, this Court respectfully **DENIES** the Motion for TRO and **DENIES without prejudice** the Motion to Expedite.

## BACKGROUND

Defendant John Cruz ("Mr. Cruz") worked as an Allstate exclusive agent between 2011 and 2020. [Doc. 1 at ¶ 20]. Alleging that Mr. Cruz breached his exclusive agency agreement and appropriated Allstate customers' information to support a competing business, Allstate filed a civil action against Mr. Cruz in late 2020. *See Allstate Ins. Co.*

*v. Cruz*, No. 20-cv-03139-NYW-MEH (D. Colo.).   The Court calls the prior civil action "*Cruz I*."[1]

**Dismissal of Cruz I.**   In *Cruz I*, Allstate brought claims for breach of contract, violation of the federal Defend Trade Secrets Act, and violation of the Colorado Uniform Trade Secrets Act.   *Cruz I*, ECF No. 1 at 15–21.   Mr. Cruz filed counterclaims for breach of contract based on nonpayment of commissions, unjust enrichment based on nonpayment of commissions, breach of contract based on nonpayment for agency termination, breach of the implied covenant of good faith and fair dealing, defamation, and discrimination.   *Cruz I*, ECF No. 40 at 15–22.   Throughout the litigation, Mr. Cruz maintained that Allstate sold customer information in exchange for gift cards.   *See, e.g.*, *Cruz I*, ECF No. 231 at 16.

On September 20, 2023, this Court granted summary judgment in Allstate's favor on all of Mr. Cruz's counterclaims.   *See Allstate Ins. Co. v. Cruz*, No. 20-cv-03139-NYW-MEH, 2023 WL 6147077, at *4 (D. Colo. Sept. 20, 2023).   The Court also granted partial summary judgment on Allstate's breach of contract claim as to liability for some of Mr. Cruz's conduct.   *See id.*   The Court reserved for trial the balance of Mr. Cruz's liability for Allstate's breach claim, damages on the breach claim, and the trade-secrets claims.   *See id.*   This Court then set the case for trial, although the trial was rescheduled several times. *Cruz I*, ECF Nos. 241, 247, 258.

On March 5, 2024, appearing before the Honorable Michael E. Hegarty, Allstate

---

[1] The Court may take judicial notice of its own files and records, facts that are a matter of public record, and filings in related cases.   *See Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006); *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("Judicial notice is particularly applicable to the court's own records of prior litigation closely related to the case before it.").

and Mr. Cruz agreed to the dismissal of *Cruz I* with prejudice.  This Court entered a Minute Order to the effect "that all claims and defenses that were or could have been brought in" *Cruz I* were dismissed with prejudice under Rule 41(a)(2).  *Cruz I*, ECF No. 269.

***Post-Dismissal Proceedings in* Cruz I*.*  On March 29, 2024, Allstate moved to re-open *Cruz I* to pursue sanctions against Mr. Cruz in connection with his alleged violation of the protective order entered in that case (the "Protective Order"), as well as to enjoin him "from making further baseless and disparaging statements about Allstate and publicly disseminating Allstate's confidential information."  *Cruz I*, ECF No. 274 at 1. Allstate's request was based on Mr. Cruz allegedly posting confidential deposition transcripts from *Cruz I* on websites that connected Allstate with various wrongdoing in the context of selling customers' personal information in exchange for gift cards.  To the extent that Allstate sought to enforce the Protective Order from *Cruz I* and obtain sanctions for its violation, those matters properly belong in *Cruz I*.  However—as counsel for Allstate generally agreed to at the hearing on the Motion for TRO—to the extent that Allstate sought in its post-dismissal motion in *Cruz I* to prevent Mr. Cruz from disparaging Allstate, that issue has been superseded by the filing of this litigation, which the Court calls "*Cruz II*."  Accordingly, on April 24, 2024, the Court authorized limited further proceedings in *Cruz I* with respect to the asserted violation of the Protective Order and ordered Mr. Cruz to show cause why he should not be held in contempt for its violation. *Cruz I*, ECF No. 282 at 3.

***Overview of* Cruz II*.*  Allstate filed this action—*Cruz II*—against Mr. Cruz and Defendant PIP Personal Identity Protection, LLC (together, "Defendants") on April 5, 2024.  [Doc. 1].  Allstate alleges that Defendants have launched a "smear campaign"

across several websites and social media platforms, as well as in television advertising, that is based on "false claims that Allstate is selling its customers' sensitive information to, among other things, further criminal activity." [*Id.* at ¶ 1]. At the hearing, Allstate explained that it learned about Defendants' alleged campaign in late March 2024, several weeks after the dismissal of *Cruz I*, when certain advertisements ran on major television networks.[2] Allstate alleges that Defendants' activity gives rise to liability for defamation and under the Colorado Consumer Protection Act ("CCPA"), and it seeks damages and injunctive relief. [*Id.* at 28–32]. The temporary restraining order and injunction sought by Plaintiff in the Motion for TRO would bar Defendants "from posting any defamatory statements or confidential information involving Allstate anywhere, including online," and require the removal of such statements within five days. [Doc. 8-3 at 1–2]. Following the hearing, Mr. Cruz filed "Supplemental Information to Hearing Dated April 23, 2024," in which he maintains that Allstate is under investigation by various regulatory authorities for "referring, sharing, transferring, and selling, customer personal information to anyone for gift cards." [Doc. 28 at 1].

**Content at Issue.**[3] Based on the submissions before the Court, it appears that this action is directed at content associated with at least six sources: (1) websites, (2) Facebook, (3) LinkedIn, (4) Instagram, (5) YouTube, and (6) television advertising.

---

[2] Mr. Cruz argued at the hearing that Allstate was aware of most of the allegedly defamatory postings far earlier, including at the March 5, 2024, status conference before Judge Hegarty. The Court assumes for purposes of this Order that Allstate was not aware of the material until several weeks after the dismissal of *Cruz I*.

[3] As all issues respecting the Protective Order in *Cruz I* that do not arise under any cause of action in this lawsuit will be adjudicated in *Cruz I*, the Court **DENIES without prejudice** Plaintiff's request that injunctive relief be directed at Defendants' use of confidential information.

With respect to websites, Allstate directs the Court to www.savemepip.com (the "First Website") and www.pip-personalidentityprotection.com (the "Second Website"), both of which appear to contain affiliate links to identity monitoring services from non-party LegalShield.  Specifically, the First and Second Websites invite users to click on "English Application," "Spanish Application," or "Abused Women Application," which, once selected, direct the user to purchase legal or privacy protection products through "Personal Identity Protection" from LegalShield at www.wearelegalshield.com.[4]   The Court has reviewed these platforms and sources, to the extent possible, and finds that, as of May 8, 2024, they contain the following representations about Allstate:

The First and Second Websites

- On the First Website, the statement:  "Our journey began with a simple yet crucial mission:  to protect the identities of individuals who entrusted their personal data to Allstate Insurance Company and its subsidiaries."

- On the First and Second Websites, the statement:  "PIP-Personal Identity Protection was created to protect the Identity of anyone who gave Allstate Insurance Company their personal information.  Name, Social Security Number, Date of Birth, Drivers License.  Anyone who gave their personal information to any of Allstate subsidiarity companies."  On the First Website's "About Us" page, as well as the Second Website's "Background" page, this text is followed by logos for Square Trade, National General Insurance, and Esurance.  On the First Website's "Home" page, this text is also followed by logos for Sam's Club, The Home Depot, eBay, Walmart, and Costco.  The First and Second Websites feature a link labeled "Subsidiaries of the Allstate Corporation," which opens a three-page document that purports to list dozens of Allstate subsidiaries by name and "jurisdiction or organization."  None of the entities identified as subsidiaries elsewhere on the First and Second Websites appear on this list.

- On the First and Second Websites, under the heading "Allstate Representatives," the statement:  "Allstate representatives have stated under oath in Federal Court, Allstate representatives are allowed to refer/share/transfer your personal information to anyone.  Depositions of Allstate Representatives, Allstate Executives are on PIP-Personal Identity Protection website:  www.pip-personalidentityprotection.com, Read what they have to say, the truth about

---

[4] The "English Application" and "Abused Women Application" are identical.

5

Allstate and the corruption taking place against you.  Allstate representatives only need to follow three (3) rules:

1. "Use Allstate electronic communication, email, phone, fax.  Used to transfer your personal information
2. "Not allowed to report to any government agency.
3. "Only form of payment allowed to be paid to Allstate representatives, Gift Cards."

- On the First Website, under the heading "Depositions," and the subheading "Discover the truth and stay informed – This is just the Beginning," the statement: "Our commitment to transparency and your personal protection is unwavering.  These partial depositions are just the initial step in our ongoing efforts to reveal the truth and expose data theft."

- On the First and Second Websites, "Download Here" links to ten PDF documents, labeled:  "Buyer Depot," "Richard Poduska," "Elise Teague," "Erika Lousberg," "Jodi Lynch," "Dino DiCarlo," "Rebecca Martens," "Must Read Updates," "Allstate Cover Up," and "The True Storey."   The first seven PDFs appear to consist of deposition excerpts from *Cruz I*.  "Must Read Updates" contains a generic warning about fraudulent driver's licenses and a screenshot of an internet posting by the Longmont Public Safety Department stating that fraudulent driver's license scams "are generally connected to rental fraud and the sale of vehicles."  Finally, "Allstate Cover Up" consists of Allstate's Omnibus Motion in Limine from *Cruz I*, while "The True Storey" consists of Mr. Cruz's opposition to that filing.

- On the First Website, the following description of "Ongoing Support" services:  "Our commitment to your security doesn't end after enrollment.  With Save Me PIP Personal Identity Protection, you can count on continuous support.  Should you ever encounter concerns or require assistance, our dedicated support team, trained in Allstate identity protection customer service, is just a call or message away.  Trust us to be your partners in personal cyber security, ensuring your peace of mind."

- On the First Website, an invitation to "Sign Up For Class Action Lawsuit" with a fillable form.  The form does not explain the nature of the class action lawsuit, but it consists of the following seven fields:  "Name," "Address," "Phone Home," "Cell," "Email," "Approx Date credit compromised," and "Approx Date inquired into Allstate Insurance Company."

- On the First Website, a 15-second video advertisement labeled "SAVEMEPIP" with the First Website's logo and URL.  The advertisement does not explicitly mention Allstate, but it appears to reference Allstate in light of the material on the First Website related to gift cards.   The advertisement states:   "Your personal information is out there, going to the highest bidder.  Put a stop to it, with Personal Identity Protection.  Don't let big companies peddle your name, social security number, or date of birth for gift cards.  Take control!  Visit our website today and

6

protect your identity, because your peace of mind matters."

- On the First Website, a 30-second video advertisement labeled "PERSONAL IDENTITY PROTECTION" featuring the First Website's name and URL, as well as the phone number 888-436-1992.[5]  The advertisement states:  "You are not in good hands with Allstate.  Has your identity been stolen?  Have you checked Allstate for insurance?  Purchased an extended warranty from Allstate?  Allstate has testified that Allstate sells your personal information to anyone for gift cards.  Your name, social security, date of birth, driver's license.  You are not in good hands.  You need Personal Identity Protection.  Go to SaveMePIP.com.  PIP.  The best protection ever, for you and your family."

- On the First Website, a 30-second video advertisement labeled "ALLSTATE" that states:  "You could be entitled to money.  In the past fifteen years, have you looked into Allstate for insurance?  Purchased a warranty from Allstate?  Allstate has testified:  Allstate has been selling your personal identity to anyone for gift cards.  Go to SaveMePIP.com.  Protect your personal identity.  Register for class action lawsuit at SaveMePIP.com.  SaveMePIP.com.  The best protection for you and your family."

- On the First and Second Websites, a 60-second animated cartoon-style video labeled "ALLSTATE INSURANCE" with the following script:  "Meet John, intent on gifting his wife a Costco washer and dryer with an Allstate warranty.  Little did he know, this decision would spiral into chaos.  With trust, John shared personal details on Allstate's site for the warranty.  Unbeknownst to him, his info was traded for gift cards, leading to false speeding accusations.  Another man gets pulled over by police for speeding.  He has authenticated driver's license which was actually John's personal information, bought from Allstate by giving gift cards.  After vacation, he discovered his compromised identity caused legal trouble by being arrested for three major speeding tickets.  Allstate's careless data handling shattered trust.  Sadly, Allstate refers, shares, and transfer your identity to anyone paid with gift cards.  This is what can happen to you when getting insurance from Allstate.  Keep safe, keep happy."  The video includes images of "John" being arrested by two police officers and placed behind bars, and prominently features the text "THIS CAN HAPPEN TO YOU."

- On the First and Second Websites, a 50-second animated cartoon-style video labeled "ALLSTATE INSURANCE" with the following script:  "Meet John, an unwitting Allstate customer.  His personal details—name, social security number, birth date, address—were traded for gift cards:  VISA, Mastercard, American Express, and Target.  John's life was traded for gift cards.  Armed with John's information, the culprit went further, discovering where he worked and his income.  They applied for credit cards and secured new car loans, eventually selling the

---

[5] According to Plaintiff, this phone number is affiliated with the location of Mr. Cruz's former Allstate exclusive agency.  [Doc. 1 at ¶ 33].

cars for parts.  Days later, John's world crumbled.  His credit score tanked, and he realized his identity was used for fraud.  The credit cards remained unpaid, leaving John with the consequences:   destroyed credit, unpaid debts, and a life in disarray."  The video concludes by depicting "John" outdoors, surrounded by bags of garbage, loose garbage, and a garbage can.

- On the First and Second Websites, a 62-second animated cartoon-style video labeled "IDENTITY THEFT" with the following script:  "In a chilling tale of identity theft and its devastating consequences, a seemingly innocent transaction at Allstate turns into a tragic human trafficking scheme.  Purchasing personal information with gift cards—names, addresses, social security numbers, and driver's license details—leads to a nightmare.  A father in dire need, seeking asylum for his wife (47) and daughter (13) finds his hopes shattered.  Their journey, marred by pain, ends in a heartbreaking discovery by law enforcement.  His wife and daughter were beaten, raped, murdered.   Only through the purchased identities were they identified, their lives taken for a few thousand dollars.  As authorities trace back, confronting a man who claims them as family, the shocking truth emerges.  Allstate's negligence in safeguarding customer's data, refusing accountability, is a betrayal of trust.  Their silence leaves lives shattered, a stark reminder of the grave consequences of unchecked information sharing."  The video depicts a girl in a cage, as well as the silhouette of a zombie hand escaping a grave, and concludes with the text "SAY NO TO SILENCE."

- On the First and Second Websites, a 59-second animated cartoon-style video labeled "HUMAN TRAFFICKING" with the following script:  "There was a miserable story of human trafficking.  The human trafficking included children, where the human trafficker impregnates one of his victims, a child.  As this was a kidnapping and sex trafficking case, the human trafficker could not bring the child to the doctor for baby delivery.  Time passes by without the doctor asking for a lot of information, whereas the police get involved due to the missing child.  The human trafficker purchases two more stolen identities, and he can move them from place to place without any reluctance.  This was a lifetime nightmare for the poor child.  Sadly, Allstate refers, shares, and transfers identities to anyone.  Keep safe, and make the world a better place."   The video includes images of silhouetted figures kidnapping women, a crying girl, and a girl locked in a cage in various settings.

- The First and Seconds Websites place the aforementioned videos on a "Protect YourSelf" page with the introductory text:   "Watch how ALLSTATE plays an important role with your identity theft."  The First Website separately includes two of the advertisement-style videos on its "Home" page.

Facebook

- Defendants created a Facebook page labeled "PIP – Personal Identity Protection" (the "Facebook Page"), accessible at https://www.facebook.com/people/PIP-Personal-Identity-Protection/61554388389179/.  The Facebook Page has 106 likes, 107 followers, and no engagement on all but a few posts.  The earliest posts

on the Facebook Page are from December 2023.  Many of the posts do not mention Allstate, but all promote the First and Second Websites.

• In February and March 2024, posts on the Facebook Page embed the videos from the First and Second Websites described above.  The text of one of the posts states:  "Watch how ALLSTATE plays an important role with your identity theft."

• A March 13, 2024, post states "PIP-Personal Identity Protection was created to protect the Identity of anyone who gave Allstate Insurance Company their personal information.  Name, Social Security Number, Date of Birth, Drivers License.  Visit now:  www.savemepip.com."

• A March 26, 2024, post embeds a video that is not on the First or Second Websites.  This video announces:  "Illegals and criminals are coming to America.  Thank you, Joe Biden.  Illegals want American identity, and they are getting America's identity thanks to Allstate.  America, you are not in good hands.  Allstate is selling America's identity to anyone for gift cards.  The vote is in.  America needs PIP Personal Identity Protection.  Go to savemePIP.com.  Save yourself, children, and family."

## LinkedIn

• Mr. Cruz has made several posts through his individual LinkedIn account that connect Allstate with selling personal information in the manner identified above.  These posts promote the First and Second Websites, and some feature videos from them.

## Instagram

• Defendants also operate an Instagram account, @pip.identityprotection (the "Instagram Account").  The earliest posts on the Instagram Account are from December 2023.  As of May 8, 2024, the Instagram Account has 40 posts and 8 followers.  The Instagram Account appears to have the same content as the Facebook Page.  The Instagram Account's profile links to the First and Second Websites.

## YouTube

• On February 13, 2024, a YouTube channel named "john cruz" uploaded the 60-second cartoon-style video about Allstate referenced above under the title "PIP VIDEO #2."  The video also includes an advertisement for the Second Website and the Instagram Account at the end.  The video has 33 views.

## Television Advertising

• Allstate alleges that Defendants have advertised on television.  Specifically, Allstate represents that Plaintiff purchased ad space through Coventry First, LLC,

and had advertisements for the First Website air on MSNBC and CNN in the Chicago market shortly before noon on March 28, 2024.  [Doc. 8 at 12].  The Court has no evidence with respect to the precise content of the advertisements, how many people viewed them, and whether they aired additional times.[6]

**Mr. Cruz's Criminal Prosecution.**   Because it is discussed in the briefing and implicated in Allstate's arguments, *see, e.g.*, [*id.* at 25], the Court takes judicial notice of the fact that Mr. Cruz is the defendant in a pending criminal matter in Boulder County, Colorado.  *See Serna v. City of Colo. Springs*, No. 23-cv-00728-DDD-MDB, 2024 WL 1714997, at *3 (D. Colo. Feb. 28, 2024), *report and recommendation adopted*, 2024 WL 1715004 (D. Colo. Mar. 29, 2024).   The Case Schedule for *People v. Cruz*, No. 2022CR000258 in Boulder County, Colorado, indicates that Mr. Cruz's criminal trial commenced on April 29, 2024.  As of May 8, 2024, the docket reflects that Mr. Cruz was convicted on all counts tried.

### LEGAL STANDARDS

### I.     Interim Injunctive Relief

Federal Rule of Civil Procedure 65 authorizes courts to enter preliminary injunctions and issue temporary restraining orders.  Fed. R. Civ. P. 65(a), (b).  "The requirements for issuing a [temporary restraining order] mirror the requirements for issuing a preliminary injunction."  *Briscoe v. Sebelius*, 927 F. Supp. 2d 1109, 1114 (D. Colo. 2013).  A party seeking preliminary injunctive relief must satisfy four factors:  (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest.  *Petrella v. Brownback*,

---

[6] In the Motion to Expedite, Allstate seeks to subpoena these television networks as well as Coventry First, LLC.  *See* [Doc. 7-2 at 34–40].

787 F.3d 1242, 1257 (10th Cir. 2015).  A party seeking an injunction must demonstrate that "*all four* of the equitable factors weigh in its favor," *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013), and a "plaintiff's failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted," *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014).  "Preliminary injunctions are extraordinary remedies requiring that the movant's right to relief be clear and unequivocal."  *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018).

## II.    Pro Se Litigants

To the extent that he has appeared in this action, Mr. Cruz has proceeded pro se.[7] *See* [Doc. 17; Doc. 28].  Accordingly, the Court affords his filings a liberal construction. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (per curiam).  But the Court cannot and does not act as his advocate, *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), and applies the same procedural rules and substantive law to Mr. Cruz as to represented

---

[7] Plaintiff represents that it has made several unsuccessful attempts at serving Defendants.  *See* [Doc. 16 at 1].  As of May 8, 2024, the docket does not reflect any return of service with respect to Defendants.  Having received notice of this proceeding from Allstate, however, Mr. Cruz appeared at the hearing on the Motion for TRO via telephone, where he provided pro se argument but refused to waive service of process.  [Doc. 22]. And this Court notes that Mr. Cruz's filings with the Court strongly suggest that Mr. Cruz has had access to the contents of the Motion for TRO and other docket entries in this action.  *See* [Doc. 17; Doc. 28].  This Court reminds Defendants that they have a "duty to avoid unnecessary expenses of serving the summons."  Fed. R. Civ. P. 4(d)(1).  To that end, "[i]f a defendant located within the United States fails, without good cause, to sign and return a waiver requested by a plaintiff located within the United States, the court must impose on the defendant:  (A) the expenses later incurred in making service; and (B) the reasonable expenses, including attorney's fees, of any motion required to collect those service expenses."  Fed. R. Civ. P. 4(d)(2).

parties, *see Murray v. City of Tahlequah*, 312 F.3d 1196, 1199 n.3 (10th Cir. 2002); *Dodson v. Bd. of Cnty. Comm'rs*, 878 F. Supp. 2d 1227, 1236 (D. Colo. 2012).

## ANALYSIS

### I.  Interim Injunctive Relief

Ordinarily, the Court would consider whether Plaintiff has met its burden with respect to preliminary relief by evaluating the likelihood of success on the merits as to each element of each claim, the prospect of irreparable harm, the balance of the equities, and the public interest.  However, the Court respectfully concludes that threshold issues with respect to Plaintiff's likelihood of success on the merits foreclose a temporary restraining order or preliminary injunction.  The Court considers these issues, which Defendants have not presented, because Plaintiff seeks an "extraordinary remed[y] requiring that the movant's right to relief be clear and unequivocal." *Planned Parenthood of Kan.*, 882 F.3d at 1223.

#### A.  Defamation

"In Colorado, the elements of a cause of action for defamation are:  (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication." *Williams v. Dist. Ct.*, 866 P.2d 908, 911 n.4 (Colo. 1993).  To the extent that the legal framework for defamation depends on whether the complaining party is a public figure or a private figure, Allstate represented at the hearing that the Court could assume for purposes of the Motion for TRO that Allstate is a public figure.  *But see* [Doc. 8 at 18 n.4 ("Allstate reserves its rights to argue its status as a private figure on a matter of private concern.")].  Although entering injunctive relief in the

context of a defamation claim can implicate serious First Amendment issues, Allstate has not reckoned with or acknowledged the constitutional repercussions of its request.  *See generally* [*id.*].

Courts that are asked to enjoin alleged defamation typically display caution.  In *Banks v. Jackson*, for example, a court in this District denied a preliminary injunction against allegedly defamatory online speech, noting that "a prior restraint of alleged defamation violates the traditional rule that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damage."  No. 20-cv-02074-DDD-KMT, 2020 WL 6870739, at *1 (D. Colo. Oct. 2, 2020) (quotation omitted).  Although the *Banks* court recognized that enjoining defamation was occasionally permissible under the "modern" approach to such requests, it explained that *preliminary* relief would be particularly inappropriate:

> [A] *preliminary* prior restraint, which is at issue here, is, in fact, something the court cannot do.  Under modern case law, an injunction of defamation is permissible only if it is (1) "narrowly tailored," (2) "based upon a continuing course of repetitive speech," and (3) "granted only after a final adjudication on the merits that the speech is unprotected."  *Auburn Police Union v. Carpenter*, 8 F.3d 886, 903 (1st Cir. 1993).  That last requirement—that a prior-restraint injunction is only permissible "after final adjudication on the merits"—is ultimately what sinks [p]laintiffs' motion in this case.  Plaintiffs ask the court to enjoin [defendant] from speaking about them (which is certainly not a narrowly-tailored request) *before* a jury has determined that [defendant's] comments were in fact false and defamatory.

*Id.* at *2 (citation omitted); *see also Wagner Equip. Co. v. Wood*, 893 F. Supp. 2d 1157, 1160 (D.N.M. 2012) (comparing traditional and modern approaches to enjoining defamatory speech).

The courts that permit injunctive relief with respect to defamation under the modern approach tend to distinguish "requests for preventive relief prior to trial," which cannot be indulged, from permissible "post-trial remedies to prevent repetition of statements

judicially determined to be defamatory." *Balboa Island Vill. Inn, Inc. v. Lemen*, 156 P.3d 339, 350 (Cal. 2007); *see also* 42 Am. Jur. 2d Injunctions § 97. "[C]ourts repeatedly have concluded that, once a judge or jury has made a final determination that the speech at issue is defamatory, an injunction prohibiting the defendant from repeating the defamatory speech does not constitute a prohibited prior restraint on speech." *Wagner Equip. Co.*, 893 F. Supp. 2d at 1161 (collecting cases); *see also Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 124–25 (Del. Ch. 2017) (referencing the "longstanding public policy against judges censoring speech and the equally longstanding preference for juries addressing defamation claims").

Allstate does not directly acknowledge any of this authority.[8]  Although Allstate cites a decision in which a court in this District ordered preliminary injunctive relief with respect to certain allegedly libelous YouTube videos, that decision did not consider the First Amendment ramifications of such relief and is therefore inapposite.  *See Muhaisen v. Does 1 Through 100*, No. 17-cv-01575-PAB, 2017 WL 4012132, at *1–3 (D. Colo. Sept. 12, 2017).   The Court must likewise reject Plaintiff's contention that Defendants' statements were judicially proven false once Mr. Cruz's counterclaims in *Cruz I* were subject to summary judgment in Allstate's favor.   *See* [Doc. 8 at 13].   That is because Plaintiff provides no authority for the proposition that the failure to muster sufficient evidence or argument in support of a legal claim in an earlier case necessarily means

---

[8] Allstate contends that injunctive relief is proper because "Defendants' harmful lies serve no First Amendment . . . purpose." [Doc. 8 at 5]; *see also* [*id.* at 26 ("Because Defendants knowingly published false statements about Allstate across the Internet, Defendants have no First Amendment protections to their posts.")].  But that is separate from the question of whether preliminarily enjoining Defendants' statements before a determination on the merits is permissible.

that a subsequent statement on a related subject has been judicially adjudicated false for purposes of a later case.  *See generally* [*id.*].  And to the extent that some of the authorities cited above contemplate a judicial officer determining falsity for purposes of enjoining defamation, the Court notes that the Complaint in this case is labeled "JURY TRIAL DEMAND" and, in it, Allstate "demands a jury trial on all issues triable as of right to a jury." [Doc. 1 at 1, 32].

However outlandish certain of the claims made by Defendants may seem, no determination of defamation has been made.  *See Banks*, 2020 WL 6870739, at *2.  That renders a temporary restraining order or preliminary injunction improper.  For that reason, the relief sought in the Motion for TRO cannot proceed via the defamation claim.

### B.    CCPA

Allstate also contends that it is "eligible for a temporary restraining order and preliminary injunction because it is likely to succeed on the merits of its" CCPA claim. [Doc. 8 at 21].  The elements of Plaintiff's CCPA claim are "(1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury."  *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146–47 (Colo. 2003) (quotation omitted). Allstate argues that it satisfies all elements.  [Doc. 8 at 21–23].  Even if Allstate is correct, it skips past a critical threshold question:  the availability of injunctive relief under the CCPA.  *See e360 Insight v. Spamhaus Project*, 500 F.3d 594, 604 (7th Cir. 2007)

(distinguishing substantive liability from "whether any particular remedy is appropriate"); *Intermountain Elecs., Inc. v. CONSPEC Controls, Inc.*, No. 2:09-cv-00020-CW, 2009 WL 2176978, at *2 (D. Utah July 22, 2009) ("[A]n injunction is not appropriate when the relief sought may not be granted as a final remedy.").

Several provisions of the CCPA are relevant. First, the statute explicitly contemplates injunctive relief in civil *enforcement* actions by providing that, "[w]henever the attorney general or a district attorney has cause to believe that a person has engaged in or is engaging in any deceptive trade practice," the government "may apply for and obtain . . . a temporary restraining order or injunction, or both, . . . prohibiting the person from continuing the practices, or engaging therein, or doing any act in furtherance thereof." Colo. Rev. Stat. § 6-1-110(1). Next, in a section concerning civil actions, the CCPA provides that "[t]he provisions of this article shall be available in a civil action for any claim against any person who has engaged in or caused another to engage in any deceptive trade practice listed in this article." *Id.* § 6-1-113(1). The statute provides for treble damages in a private civil action under the CCPA, as well as awards of costs and reasonable attorney's fees. *Id.* § 6-1-113(2). Finally, pursuant to a recent amendment, the statute specifies that, "[i]n a case certified as a class action, a successful plaintiff may recover actual damages, injunctive relief allowed by law, and reasonable attorney fees and costs." *Id.* § 6-1-113(2.9).

Courts that have considered the interplay between these provisions tend to find injunctive relief unavailable in private actions under the CCPA. For example, Judge Hegarty has previously reviewed the structure of the statute and determined that injunctive relief is not a remedy for the private CCPA litigant:

> Considering the statute as a whole . . . , the Court finds that while Colorado's General Assembly included injunctive relief as a remedy that may be pursued by the Attorney General or a district attorney (*see* Colo. Rev. Stat. § 6-1-110), the Assembly intentionally omitted injunctive relief as a remedy for a private cause of action under the CCPA (*see* Colo. Rev. Stat. § 6-1-113) and, thus, Plaintiff may not seek injunctive relief in this case on behalf of either himself or a class.

*Carter v. Amica Mut. Ins. Co.*, No. 17-cv-02156-RM-MEH, 2018 WL 3093320, at *9 (D. Colo. June, 22, 2018), *report and recommendation adopted*, 2018 WL 4368668 (D. Colo. July 11, 2018).  Other courts in this District have reached the same conclusion.  *See, e.g.*, *Monson v. Country Preferred Ins. Co.*, No. 17-cv-02130-RBJ, 2018 WL 11016704, at *7 (D. Colo. Sept. 28, 2018) (concluding that "the remedies listed for private causes of action in § 6-1-113(2) are exclusive, so that an injunction, as a remedy that is not listed, would be unavailable" to a private litigant).  Although the relevant statute has since been amended, it appears that the changes only reinforce the foregoing interpretation.

In 2022, the Colorado General Assembly revised the CCPA to provide, as excerpted above, that "[i]n a case certified as a class action, a successful plaintiff may recover actual damages, injunctive relief allowed by law, and reasonable attorney fees and costs."  Colo. Rev. Stat. § 6-1-113(2.9); *see also Vandiver v. MG Billing Ltd.*, 653 F. Supp. 3d 884, 891 (D. Colo. 2023).  As amended, the statute has no reference to injunctive relief for private litigants that—like Allstate here—are not part of a class.  *Cf. Hall v. Walter*, 969 P.2d 224, 232 (Colo. 1998) (noting that the CCPA and its damages remedy "departed significantly" from the Revised Uniform Deceptive Trade Practices Act, which makes injunctive relief available to private litigants).  The Court thus discerns no basis for departing from the reasoned analysis in *Carter* and *Monson*.  If anything, the 2022 amendment bolsters those courts' conclusions by underscoring the omission of injunctive relief for individual CCPA actions.  And Allstate does not direct the Court toward

any case granting injunctive relief in a private suit under the CCPA, as the cases it relies upon appear to award injunctive relief under other statutes.  *See, e.g.*, *Otter Prods., LLC v. Fisch Enter., Inc.*, No. 19-cv-00030-CMA-KLM, 2019 WL 7290937, at *7–8 (D. Colo. Oct. 3, 2019) (awarding injunctive relief under the Lanham Act, which "authorizes a district court to issue an injunction according to the principles of equity and upon such terms as the court may deem reasonable to prevent violations of trademark law").  This Court finds no basis in the statute for awarding injunctive relief on a CCPA claim brought by a plaintiff that is not suing on behalf of a class.  That renders preliminary injunctive relief improper. *See Intermountain Elecs., Inc.*, 2009 WL 2176978, at *2.  The Motion for TRO is respectfully **DENIED**.

## II.   Expedited Discovery

Plaintiff also seeks to expedite discovery so as to determine the full extent of Defendants' activities for the purpose of enjoining them.  *See* [Doc. 7 at 9 (Allstate's requested discovery will "ensure that all defamatory statements are removed")].  "As a general rule, discovery proceedings take place only after the defendant has been served." *Columbia Ins. Co. v. seescandy.com*, 185 F.R.D. 573, 577 (N.D. Cal. 1999).  Here, more than a month has passed since the Complaint's filing, and Plaintiff has neither submitted a return of service with respect to Defendants nor sought leave to serve Defendants by alternative or substituted means.  However, exceptions may be made, and early discovery permitted, for good cause.  Here, Plaintiff indicates that its "proposed discovery requests are narrowly tailored and designed to determine:  (a) who Cruz published defamatory statements to; (b) where Cruz published his defamatory statements; and (c) the extent of Cruz's unlawful possession of Allstate's confidential information."  [Doc. 7 at 9].

The Court recognizes that the discovery contemplated by Allstate would serve the purposes identified and advance this action by clarifying what is at issue.  However, the Court respectfully concludes that good cause does not support authorizing discovery before Defendants have been served with process.  To the extent pre-service discovery tends to focus on identifying unknown defendants, *see, e.g.*, *Hq|publications, LLC v. www.allcollegesearchdirectory.com*, No. 06-cv-00124-EWN-MEH, 2006 WL 8460625, at *1 (D. Colo. Feb. 28, 2006), Plaintiff seeks to identify Defendants' publications, not Defendants' identities.  *See generally* [Doc. 7].  To the extent expedited discovery is sometimes permitted in the context of preliminary relief, *see, e.g.*, *SBS Franchising, LLC v. Smith*, No. 19-cv-01692-DDD-STV, 2019 WL 13201521, at *2 (D. Colo. July 3, 2019) ("The good cause standard may be satisfied when a party seeks a preliminary injunction."), this Court's disposition of the Motion for TRO undermines any such rationale, *see id.* (acknowledging that expedited discovery "should be narrowly tailored to seek information necessary to support the application for preliminary relief").  Due to the Court's denial of the Motion for TRO, Plaintiff cannot show good cause to serve discovery prior to service of process on Defendants.  The information Plaintiff seeks through the Motion to Expedite does not affect the availability of injunctive relief under the CCPA or the fact that none of Defendants' statements have been adjudicated false.  The Motion to Expedite is therefore **DENIED without prejudice**.

To the extent that Plaintiff continues to seek the same or similar relief after effectuating service of process on Defendants, it may renew its request.[9]  In this regard,

---

[9] To the extent that Plaintiff concludes that Defendants are improperly evading service, this Court expects that it will pursue alternative service through an appropriate motion.

however, the Court observes that Judge Hegarty has set a Scheduling Conference for June 12, 2024, with a Proposed Scheduling Order due by June 5, 2024.  [Doc. 26].  The accelerated proceedings sought by Plaintiff may be most efficiently pursued in the context of scheduling the case before Judge Hegarty.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that:

(1)     Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction [Doc. 8] is **DENIED**;

(2)     Plaintiff's Motion for Expedited Discovery [Doc. 7] is **DENIED without prejudice**; and

(3)     The Clerk of Court is **DIRECTED** to mail a copy of this Order to:

John Cruz
4888 Preserve Place
Firestone, CO 80504


DATED: May 8, 2024                              BY THE COURT:

                                                _____
                                                Nina Y. Wang
                                                United States District Judge